11-4462.131-JCD                                        August 29, 2013

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CRAFTWOOD LUMBER COMPANY,        )
                                 )
          Plaintiff,             )
                                 )
     v.                          )     No. 11 C 4462
                                 )
INTERLINE BRANDS, INC., a Delaware )
corporation, and INTERLINE       )
BRANDS, INC., a New Jersey       )
corporation,                     )
                                 )
          Defendants.            )

### MEMORANDUM OPINION

Plaintiff has filed a motion for discovery sanctions pursuant to Federal Rule of Civil Procedure 37(b) and (d), which is granted for the reasons explained below.

### BACKGROUND

Plaintiff, Craftwood Lumber Company ("Craftwood"), brought this putative class-action suit against two affiliated entities, Interline Brands, Inc., a Delaware corporation; and Interline Brands, Inc., a New Jersey corporation (collectively, "Interline" or "defendant"). Interline distributes and markets maintenance, repair, and operations products, such as hardware, plumbing, and electrical products. Craftwood alleges that Interline violated provisions of the Telephone Consumer Protection Act of 1991, as amended by the Junk Fax Prevention Act of 2005 ("Junk Fax Act" or

- 2 -

the "Act"), 47 U.S.C. § 227, and the regulations promulgated under the Junk Fax Act by the Federal Communications Commission, by sending at least 1,500 advertisements in at least 735,000 facsimile transmissions, some of which were received by Craftwood. The faxes advertised Interline's products. There are two defenses to a Junk Fax Act claim: "prior express invitation or permission" ("PEP") and "established business relationship" ("EBR"). Craftwood alleges that because Interline's faxes failed to comply with the Act's opt-out notice requirements, Interline is precluded from asserting these defenses. (Compl. ¶ 17.) It is also alleged that Interline's violations of the Act were willful and/or knowing. (Compl. ¶ 18.) Craftwood seeks statutory damages of $500 for each violation of the Act and the trebling of such damages for willful and/or knowing violations, in addition to costs and attorneys' fees and various forms of injunctive relief.

The parties have been engaged in a drawn-out discovery process addressed to class certification. Craftwood contends that Interline failed to serve timely (and promised) supplemental responses to discovery requests and failed to provide signed or attested responses, even after this court had ordered Interline to respond to all outstanding discovery requests by October 12, 2012. A host of supplemental discovery requests are involved, but the discovery with which Craftwood is primarily concerned pertains to Interline's possible PEP and EBR defenses. Craftwood has moved

- 3 -

under Federal Rule of Civil Procedure 37(b)(2)(A)(ii) and (d)(1)(A)(ii) and (3) for an order prohibiting Interline from supporting any PEP or EBR defense, offering evidence in opposition to class certification, and relying on any communications with putative class members about the lawsuit.

### DISCUSSION

**A.    The Discovery Process**

In its opening brief and reply brief, and the accompanying declarations and supplemental declarations of its counsel, Scott Z. Zimmermann and C. Darryl Cordero, Craftwood sets forth, in painstaking detail, the discovery timeline in this case.  Craftwood served initial interrogatories and document requests on the Interline entities in August 2011.  Interline responded to those requests in November 2011 (after Craftwood had agreed to two extensions of time for Interline to do so).  Craftwood asserts that Interline's responses were woefully deficient, and it focuses on the information (or lack thereof) produced by Interline concerning PEP and EBR--in particular, a table[1] that Interline had provided in response to several interrogatories about the fax transmissions. Interline described its table as follows:

> Beginning in November or December of 2008, fax lists would have been created on or about the time the fax was transmitted and lists were created from three sources: **Source Code (1)** lists derived from inquires [sic] of

---

[1] Interline labeled it as five separate tables, but we will treat it as a single table.

- 4 -

Interline customer data base; **Source Code (2)** lists derived from telemarketing from [sic] lists or leads: done by sales representative (Catherine McRae) or administrative assistant (Unique Ramos or potentially other unknown individuals): calls were made to leads on lists who granted permission to send fax ads; and **Source Code (3)** lists were purchased or rented from list providers and faxes were sent to companies on such lists without contacting them for permission. Websites of chains were also used to generate lists. Attached hereto are Tables 1-5 which list the 1,514 fax ad transmissions sent by WestFax or Protus.[2] Each of the tables contains a column titled "List Source" and one of the three source code [sic] (1, 2, or 3) indicating to the best of Interline's corporate knowledge, the source of the fax list for each of the transmissions.

(Decl. of C. Darryl Cordero, Ex. 1, Interline New Jersey's Resp. to Pl.'s First Set of Interrogs. ¶ 5.)

In response to an interrogatory that asked Interline to, "[s]eparately for each FAX, identify each PERSON (by name, last known home and business address and telephone number and job title) whom YOU conten[d] gave PRIOR EXPRESS INVITATION OR PERMISSION to be sent the fax," Interline responded:

Defendant objects to the narrative response required under this interrogatory as it applies to over 1,500 or more facsimile transmissions and on the grounds of relevance and that the interrogatory is unduly burdensome. Without waiving this objection, Defendant answers as follows. It is believed that each of the facsimile transmissions identified in Tables 1-5 attached hereto, which contain a Source Code of 2, were transmissions in which the recipient granted permission to send the fax. It is possible recipients of fax transmissions with Source Codes of 1 and 3 may have also given express permission to send the faxes, but at this

---

[2] WestFax and Protus are two outside vendors that began sending fax transmissions on Interline's behalf in November and December 2008. (Interline New Jersey's Resp. to Pl.'s First Set of Interrogs. ¶ 3.)

point Interline does not have any specific information to
so indicate.

(Interline New Jersey's Resp. to Pl.'s First Set of Interrogs. ¶

8.)

In response to an interrogatory that asked Interline to

identify each person with whom Interline contended it had an

established business relationship at the time a fax was sent,

Interline responded:

> . . . [F]rom the beginning of the putative class period
> to November or December of 2008, it is believe[d] that
> individual sales representatives conducted *ad hoc* fax
> marketing activity and sent fax ads using fax machines
> leased by Interline which are believed to have been sent
> to lists of customers obtained from Interline's customer
> data base.  No regular business records of this activity
> appear to exist, however since the source of the lists
> was the Interline customer data base, Interline had an
> established business relationship with these recipients.
> Beginning in November or December of 2008, Interline
> began using third party vendors to send faxes and these
> vendors reportedly sent over 1,500 facsimile
> transmissions which are set forth in Tables 1-5 which are
> attached to Interline's answers to Plaintiff's First
> Interrogatories ("Tables 1-5").  Interline had an
> established business relationship with the recipients of
> all the fax transmissions identified in Tables 1-5 as
> Source Code 1 in the column titled "List Source."  The
> source of the fax list for all the transmissions with
> Source Code 1 was the Interline customer data base so
> therefore Interline had an established business
> relationship with the recipients of these facsimile
> transmissions.  With respect to the identifying
> information for each of the recipients of these facsimile
> transmissions, each of the transmissions is identified in
> Tables 1-5 with a unique reference number in the column
> titled "Ref #."  Interline is producing in connection
> with its responses to these interrogatories and
> Plaintiff's requests for production an electronic file
> folder containing individual fax lists for the
> transmissions listed in Tables 1-5 to the extent such fax
> lists exist.  Any identifying information as to the

- 6 -

individual recipients of the Source Code 1 facsimile transmissions is contained in the electronic file folder containing the fax lists produced by Interline. Each fax list file begins with the unique transmission reference number for the transmission[] listed in Tables 1-5.

Interline had an established business relationship with some of the recipients of Source Code 2 and 3 facsimile transmissions as identified in Tables 1-5, but Interline has no customer-specific information at this stage documenting the nature of such a relationship and investigation continues.

(Cordero Decl., Ex. 2, Interline New Jersey's Resp. to Pl.'s Second Set of Interrogs. ¶ 12.)

Interline's table contained information about faxes sent in the years 2008-2011, listed by reference number, source code (as described above), number of faxes reportedly sent in each transmission, date and time sent, sending vendor, document number, and advertised brand. (Decl. of Bart T. Murphy ¶ 7 & Ex. 1.) The table did not identify any fax recipients or fax numbers.[4] At that point, Interline did not provide any other discovery responses that supported its assertions of PEP and EBR or that identified its customers or anyone who had granted permission to send faxes.

In December 2011, Craftwood replied to Interline's responses with a multi-page "punch list" describing in great detail what it viewed as the deficiencies in Interline's responses. (Decl. of Scott Z. Zimmermann ¶ 4, Ex. 7.) Those deficiencies included Interline's failure to fully answer interrogatories that related to

---

[4] Lists of fax numbers (without identification of actual recipients) were produced separately.

- 7 -

PEP and EBR and to provide any verification of those responses by an officer of Interline. (Interline had promised Craftwood a verification, but it appears that it did not actually provide verifications of any of its discovery responses until December 2012, after the instant motion for sanctions had been filed.)

During January and February 2012, counsel for the parties had a number of conference calls about discovery. In a fourth conference call on February 7, 2012, counsel for Interline, David K. Callahan and Bart T. Murphy, stated that Interline would serve, by February 28, 2012, supplemental responses to the document requests and certain PEP-related interrogatories and to advise no later than February 15, 2012 whether Interline would provide supplemental responses to certain EBR-related interrogatories. (Zimmermann Decl. ¶ 5.) Interline did not do so, and it did not respond to the subsequent attempts of Messrs. Zimmermann and Cordero to obtain the supplemental discovery over the next few months. (Zimmermann Decl. ¶ 6; Cordero Decl. ¶¶ 10-12.)

On August 17, 2012, Mr. Cordero sent a letter to Messrs. Murphy and Callahan about the long-overdue discovery, along with copies of six prior letters or e-mails asking for the discovery. Mr. Murphy replied the same day via e-mail; he did not dispute that supplemental discovery was overdue, and he did not contend that plaintiff's requests were improper. He stated that he was "in the process of reviewing and updating discovery responses" but did not

say when Interline would produce this discovery. (Cordero Decl., Ex. 26.) On August 27, 2012, Mr. Murphy sent Messrs. Cordero and Zimmermann a letter that purported to supplement discovery responses but did not actually refer to any particular interrogatory or document request. The letter identified 14 Interline employees or former employees "with information regarding consent forms Interline sent to its customers in August 2003 and the return of those forms by customers" and 23 representatives of "Interline customers who can testify that they want to receive promotional faxes from Interline, in some cases have consented to receive them and these faxes were useful in running their business." (Zimmermann Decl., Ex. 19.) Mr. Murphy also stated that Interline's "search for consent forms, and customers who consented to receive faxes, continues" and that its process of reviewing certain e-mails that plaintiff had requested was "ongoing, as is our attempt to respond to a multitude of other issues you have raised." (Zimmermann Decl., Ex. 19, at 7.)

Mr. Zimmermann then e-mailed Messrs. Murphy and Callahan the same day, asking for specific supplemental responses and document production, including the identification of those who gave Interline PEP and documents showing PEP and EBR. He received no response. On September 4, 2012, Mr. Zimmermann sent Messrs. Murphy and Callahan a follow-up e-mail requesting the same information. It is unclear whether Mr. Zimmermann received a response, but in

any event, he did not receive any of the requested discovery.
(Zimmermann Decl. ¶ 9.) On September 5, Mr. Cordero sent Messrs.
Murphy and Callahan a follow-up e-mail inquiring about updated
discovery responses and asking that Interline inform Craftwood no
later than September 11 about which items of discovery would be
produced and by what date. He received no response.

On September 12, we held a status conference; Mr. Cordero was
present for Craftwood, and Mr. Callahan was present for Interline.
The colloquy regarding discovery was as follows:

> MR. CORDERO: The status . . . is that . . . we have a
> pent-up list of discovery needs. And
> most recently, Mr. Murphy, who's not with
> us today, wrote me and said that he would
> be--he intended to supplement and add to
> the defendants' discovery responses. And
> I've been trying to--in anticipation of
> today's conference, have been trying to
> get him to commit to what it is
> [Interline is] going to be supplementing
> and when [Interline is] going to
> supplementing by, but we don't have an
> answer yet.
>
> So we have to really pull together a
> lot of loose ends on discovery, some of
> which--a lot of which Mr. Murphy has
> committed to providing us.

> THE COURT: How long do you think it would take him
> to do it at the outs[ide]?

> MR. CORDERO: Well, I would like Mr. Murphy and the
> defendants to provide the discovery that
> they've promised us by the end of this
> month.
>
> Some of this discovery--just for
> refreshing Your Honor's recollection, we
> had a conference call with defense
> counsel on February 7, and they had
> promised complete supplemental responses

- 10 -

to document requests and interrogatories
by February 28.

So, a lot of this has been pent up
for several months. And I would think by
the end of this month would be a
reasonable time, unless--I mean, if Mr.
Callahan or Mr. Murphy tell me that there
is one particular item that's difficult,
I'm happy to work with them.

MR. CALLAHAN: And, Your Honor, I think there's--a
couple things. One is there have--we
certainly did have a conversation in
February, but there have been a lot more
discovery and a lot more requests since
then.

So I do think it would be a good idea
for us to mutually try to figure out what
discovery needs to be produced and the
parties are going to agree to produce,
and I think there are some things on
their side as well, and what things--and
there may be a couple things that the
parties are digging in on, and get those
issues resolved.

THE COURT: But February to September is a long time.
What I will do is enter an order today on
the defendants to produce all outstanding
discovery owing to the plaintiff no later
than--let's make it October 12.

MR. CORDERO: Your Honor, I have a question.

THE COURT: Yes.

MR. CORDERO: Magistrate Judge Kim is assigned to this
case. If a motion to compel becomes
necessary, would we bring that before you
or--

THE COURT: Bring it before me.

MR. CORDERO: --before Judge Kim?

THE COURT: Sure, bring it before me.

MR. CORDERO: All right.

- 11 -

MR. CALLAHAN:    And I take it, Your Honor, that would be
                 true with respect to all outstanding
                 discovery, coming to the--

THE COURT:       Both sides.  I mean--

MR. CALLAHAN:    That's fine.

THE COURT:       --if the plaintiff is delinquent on
                 anything, that should be--

MR. CALLAHAN:    Great.

THE COURT:       --produced as well, but--

MR. CALLAHAN:    And on anything we can't resolve, we will
                 mutually address that to Your Honor.

THE COURT:       Sure.

MR. CALLAHAN:    Very good.

(Cordero Decl., Ex. 29, Tr. at 2-5.)  Our order of September 12
stated: "The parties shall respond to all outstanding discovery
requests no later than October 12, 2012."[5]

On September 19, 2012, Mr. Cordero again wrote Messrs. Murphy
and Callahan about Interline's outstanding discovery.  He asked
that defendants provide all outstanding discovery discussed in
eight prior communications from plaintiff, beginning with the
December 2011 "punch list," and listed those eight communications.
Mr. Cordero also emphasized that plaintiff had "attempted for over
one year to obtain information from Defendants about prior express

---

[5] Thereafter, Craftwood produced its supplemental responses to certain
document requests on September 26, 2012; prior to a September 18, 2012 letter
from Mr. Callahan, the last time Interline had raised any concerns about
Craftwood's document production had been in April 2012, and Craftwood had
promptly responded to each of the specific issues.  (Zimmermann Decl. ¶ 10, Ex.
11.)

permission," and he asked for complete responses to discovery requests on the subject. (Cordero Decl., Ex. 31, at 2.) A copy of Mr. Cordero's letter of September 19 is attached to this opinion as Exhibit A.

On October 2, 2012, Mr. Callahan sent Mr. Cordero an e-mail (copying Mr. Zimmermann), a copy of which is attached hereto as Exhibit B, stating in pertinent part:

> . . . Your letter of September 19, 2012 reflects Craftwood's efforts to constantly move the goal posts and to shift its own discovery burdens upon Interline.
> Interline is in no position to inform you of "what specific Discovery [it] will not provide" because it is not clear what discovery you are requesting. Your letter does not cite any *specific* deficiencies in Interline's discovery responses. Rather, you simply list eight (8) pieces of correspondence exchanged by the parties from December 2011 to August 2012 (a 10-month period) and insist that Interline "provide all outstanding discovery" related to the same. This is not enough. Interline cannot determine what additional discovery, if any, Craftwood is entitled to when Plaintiff's counsel cannot identify specific actionable deficiencies.
> If Craftwood is able to identify concrete, actionable deficiencies in Interline's discovery responses, we will consider such requests and meet and confer with you about resolving your concerns. But we will not agree to permit Craftwood to impose undue burden and expense on Interline in both discerning the meaning of your vague requests and complying with your ever shifting demands.
> . . . [Y]our allegation that Interline is withholding discovery related to its customers is wholly without merit. As you concede, Interline has already provided you with discovery about existing customers that have voiced support for Interline's fax advertising campaign and distaste for this lawsuit.

(Cordero Decl., Ex. 32.)

- 13 -

Mr. Cordero responded to Mr. Callahan (copying Mr. Murphy) via e-mail on October 5; that letter is attached hereto as Exhibit C. Mr. Cordero characterized as "nonsense" Mr. Callahan's contention that Interline could not determine what outstanding discovery was being sought.  He described in detail four examples of prior communications from plaintiff concerning its discovery requests, in response to which neither Mr. Murphy or Mr. Callahan had expressed any confusion.  Mr. Cordero also took issue with Mr. Callahan's representation that Interline had "already provided" discovery about existing customers, explaining that Mr. Murphy's August 27 letter was not a proper discovery response and that Craftwood had previously repeatedly and specifically asked for verified supplemental responses and document production regarding the identities of those who had given Interline prior express permission to send fax advertisements.  Enclosed with Mr. Cordero's letter were copies of Craftwood's prior communications about the deficiencies in Craftwood's discovery production, with annotations that explained the current status of each request.  The annotations indicated that much was outstanding.  Mr. Cordero asked Mr. Callahan to inform him by the close of business on October 8, 2012 "what specific deficiencies in these communications you will not correct with supplemental discovery," and he offered to clarify any items that caused confusion.  (Cordero Decl., Ex. 33, at 5.)

- 14 -

Neither Mr. Callahan nor Mr. Murphy responded to Mr. Cordero's letter of October 5. (Cordero Decl. ¶ 22.) Interline did not produce any supplemental discovery to Craftwood by the October 12 deadline. Neither Mr. Murphy nor Mr. Callahan responded substantively to Mr. Cordero's subsequent efforts to ascertain if any discovery would be forthcoming.

On October 30, 2012, more than two weeks after the deadline had passed, Mr. Cordero received two sets of supplemental responses to interrogatories from the Interline defendants. Neither set was signed by an Interline officer or sworn under oath. Interline still did not identify any particular person or entity that allegedly gave prior permission to send fax advertisements. The interrogatories did state, in part, that "[i]t is believed that a significant number of receipients of fax transmissions identified in Tables 1-5 . . . with Source Code 1 likely provided their consent to receive faxes through a variety of means (including oral, written, or other consent) and that such information was tracked by Interline in the customer database from which these fax lists were generated." (Cordero Decl., Ex. 34 ¶ 8.) The interrogatory response went on to describe Interline's customer databases, which it said indicated "an effort by Interline to carefully track its customers' consent," but Interline did not produce the databases or data contained therein. (Cordero Decl., Ex. 34 ¶ 9.)

- 15 -

On November 7, 2012, we held another status hearing. Mr. Cordero informed us that "October 12 came and went, and [Craftwood] did not receive discovery," that Mr. Callahan had sent a letter expressing confusion, and that on October 30, Interline had provided "unverified supplemental answers to interrogatories" that "did not address the basic defects in the prior set of discovery that [Craftwood] had asked [defendants] to provide in February, nor" had Craftwood received supplemental responses to document requests. (Cordero Decl., Ex. 36, Tr. at 2-3.) Mr. Cordero also stated: "We believe firmly that the best course of action is for us to make a Rule 37 sanctions motion. Because of the yearlong failure of this--these defendants to provide this discovery, we think we're at a point where we've been asking for this stuff over and over and over and over." (Tr. at 3.)

Mr. Callahan responded that "we tried, as we have been trying, to focus what the [discovery] disagreement was" and that the October 30 production was in response to "additional discovery" that plaintiff had served two weeks after the September status. He sidestepped the issue of why Interline had not produced anything between September 12 and October 12. (Tr. at 4.) Mr. Callahan stated that the discovery issues "would be a great subject for a motion to compel." (Tr. at 4-5.) When we inquired about the nature of the disputed discovery, the following colloquy took place:

MR. CORDERO:    . . . From the very beginning of the case, starting in August 2011, we asked them by way of interrogatories: "Please identify every person who you contend gave you prior express permission to send the junk fax." We asked that because that's one of the two statutory defenses. We wanted to know of all these people you blasted faxes to, who are the ones you contend told you in advance that it was permissible for you to send them?

When we got their interrogatory answers, they refused to tell us who those people were. Instead, what they said was, "Oh, well, there's--we've given you a table of all our fax transmissions, and people on source code 2 gave us consent. And there's a potential that people on source code 1 and 3 gave us consent."

But, again, they never told us who those people were.

We also said, "Tell us the circumstances by which you obtained that consent," because the FCC has made very clear that a fax blaster like these defendants has to keep records . . . . [T]hey never identified who the people were, even on source code 2. . . . [W]e sent them a lengthy, what we called a punch list of all the defects in their discovery responses. And the key element on the punch list was "You still haven't answered the interrogatory. You still haven't told us who are the people you contend gave you prior express permission to send your junk faxes. And you haven't told us the communications by which they gave that consent."

THE COURT:    Let me interrupt and ask the [defendant] to give me your answer to this particular point.

MR. CALLAHAN:    So to this particular point, Your Honor, there is a great deal more information that we provided on the topic of prior express permission and preexisting

customer relationships. We spent the majority of the spring and early summer taking depositions of people who had the responsibility at each--the company's got a bunch of different brands. We identified an individual with respect to each brand . . . who could say, "This group of people, this is where we got the fax lists from. We didn't buy them from somebody; they were our customers."

And we went further. We provided them with the identification of specific individuals in some instances--obviously, it's not 800,000 people--but specific individuals who confirmed what our business people said at the depositions, which is that they're our customers. . . .

THE COURT: Have you given the names of any customers?

MR. CALLAHAN: We've given the names of some customers. We've not turned over the 700,000 customer list, your Honor. It's a smaller anecdotal list of dozens of customers.

Now, they have the fax numbers for every single customer organized--

THE COURT: Let me interrupt here.

I think that a motion for sanctions is something the Court will entertain here. It's hard for me to believe that you can't come up with--how long has this case been pending?

MR. CALLAHAN: A little over a year, your Honor.

. . .

THE COURT: All right. Make your motion for sanctions.

. . .

MR. CALLAHAN: [Y]our Honor, I think particularly in light of the fact that we were here last time, what we discussed was the Court

- 18 -

> telling the parties, "See if you can't
> work these things out."

THE COURT:    You can say that in your response.

MR. CALLAHAN:    "If you can't, file a motion to compel."

THE COURT:    You can say that in your response.

MR. CALLAHAN:    Okay.

THE COURT:    And it would be helpful to me, if I said
something that led you to believe it
wasn't necessary to comply with these
discovery requests, have the transcript
written up and give it to me.

(Tr. at 5-9, 11.)

Thereafter, the instant motion was filed and briefed--which brings us to a preliminary matter, Interline's motion to strike certain materials that Craftwood filed. Interline first complains that Craftwood used a "disrespectful" "formatting trick" by including in its reply brief a chart, setting forth the discovery timeline, that uses a 10-point font at best when our local rules require the use of a 12-point font in the body of a filing. (Def.'s Mem. in Supp. of Mot. to Strike at 1-2.) The argument is an utter waste of time. The chart is plainly legible, so we do not see any harm in Craftwood using a smaller font to fit its chart on one page. Craftwood's reply brief was fifteen pages long; if it had used a 12-point font for its chart and requested an extra page or two for its brief, we would have granted the request.

The second issue Interline raises is that Craftwood, along with its reply, filed an additional document titled "Plaintiff's

Evidentiary Objections to Murphy and Radcliffe Declarations Submitted in Opposition to Plaintiff's Motion for Sanctions." Interline argues that some of the objections are not truly evidentiary and that plaintiff "had the option to file a motion to strike these filings and voice its 'evidentiary objections' there." (Def.'s Mem. in Supp. of Mot. to Strike at 3.) The vast majority of the objections Craftwood raises are, however, evidentiary, and we see no reason why Craftwood had to raise those objections in the form of a motion. In fact, we believe that the document is preferable to a motion to strike. Interline's motion to strike will be denied; the matters the motion addresses were not worth complaining about.

**B.** **Rule 37 Sanctions**

Federal Rule of Civil Procedure 37(b)(2)(A) provides that a court may impose various sanctions on a party who fails to obey a discovery order, including the entry of an order "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." Fed. R. Civ. P. 37(b)(2)(A)(ii). "The sanctions outlined in Rule 37 provide a district court with valuable tools for preventing the parties to a lawsuit from 'unjustifiably resisting discovery.'" Tamari v. Bache & Co. (Lebanon) SAL, 729 F.2d 469, 472 (7th Cir. 1984) (quoting Fed. R. Civ. P. 37 advisory committee's note). They also "provide the district court with an effective means of

ensuring that litigants will timely comply with discovery orders."
Melendez v. Ill. Bell Tel. Co., 79 F.3d 661, 670 (7th Cir. 1996).

Rule 37 sanctions "are proper upon a finding of wilfulness, bad faith, or fault on the part of the noncomplying litigant." Melendez, 79 F.3d at 671. "These three measures of culpability are each wholly distinct from one another. 'Bad faith,' for instance, is characterized by conduct which is either intentional or in reckless disregard of a party's obligations to comply with a court order. 'Fault,' by contrast, doesn't speak to the noncomplying party's disposition at all, but rather only describes the reasonableness of the conduct--or lack thereof--which eventually culminated in the violation." Marrocco v. Gen. Motors Corp., 966 F.2d 220, 224 (7th Cir. 1992).

Craftwood contends that by providing no supplemental discovery by October 12, 2012, Interline clearly violated this court's order of September 12, 2012, which directed the parties to respond to all outstanding discovery requests by that date. Craftwood points out that the supplemental responses Interline produced on October 30 were incomplete, unverified, and still failed to identify fax recipients who had an EBR with Interline or had provided PEP.[6] In Craftwood's view, "the only appropriate sanction is an order precluding [Interline] from asserting facts relating to any PEP or

---

[6] It is noted in plaintiff's reply brief that on December 10, 2012 (two days before Interline filed its response brief), Interline served plaintiff with a verification of its supplemental responses. (Pl.'s Reply at 3.)

- 21 -

EBR defense, or opposition to class certification," because this sanction is specifically tailored to the discovery that Interline repeatedly failed to provide for many months. (Pl.'s Mem. in Supp. of Mot. at 17.) Craftwood also asserts that we can find fault, bad faith, and willfulness and that Craftwood has been prejudiced because it still does not know, well over a year after requesting PEP and EBR discovery, who is claimed to have given Interline PEP or had an EBR with it.

In response, Interline argues that plaintiff's motion amounts to an "effort to turn a routine discovery dispute into a *de facto* ruling on class certification." (Def.'s Resp. at 1.) It characterizes the "question at bar" as being "relatively simple--can Plaintiff insist that Interline must conduct a recipient-by-recipient analysis of the precise facts relating to EBR and PEP for each and every member of the purported class in order to defend itself even though Plaintiff claims that it will be able to proceed in this litigation using generalized proof?" (Def.'s Resp. at 10.) According to Interline, "conducting such [an] analysis for all Interline brands would likely require between 18,500 and 43,500 man-hours." It submits the declaration of Ruth Radcliffe, an "E-Tail Strategic Accounts Manager" for Interline, to that effect. (Def.'s Resp. at 11 (emphasis omitted); Decl. of Ruth Radcliffe ¶ 12.)

- 22 -

Further, Interline maintains that it "has devoted (and continues to devote) considerable time, energy, and resources to meeting the overbroad and mercurial demands of Plaintiff" and that Interline disclosed "at the very outset of discovery" that "in the vast majority of cases Interline generated fax lists using its database of existing customers." (Def.'s Resp. at 2-3 (emphasis omitted).) Interline also states that it has in fact gone above and beyond its discovery obligations by also producing "summaries generated to analyze the scope of the faxes at issue in order to provide Plaintiff with a manageable way to analyze the nature and size of the purported class." (Def.'s Resp. at 8.) (These are the same tables discussed supra that do not actually identify the fax recipients.) Interline notes that it has produced a number of employees for deposition who have knowledge about how the fax lists were generated and how Interline "acquired and tracked consent." (Def.'s Resp. at 9.)

Interline submits that as of October 12, 2012, it had "provided 'all outstanding discovery' to Plaintiff based on its good faith understanding of this Court's directive." (Def.'s Resp. at 12.) In Interline's view, we should "simply treat the instant motion as a motion to compel," and Craftwood "should not be permitted to . . . immediately move for sanctions simply because [Craftwood] disagree[s] with the substance of Interline's objection." (Def.'s Resp. at 6, 20.)

- 23 -

Whether Craftwood should be "permitted" to move for sanctions without having filed a motion to compel is a question that we already answered in the affirmative on November 7, 2012, after considering Mr. Callahan's statements about what discovery Interline had and had not produced. "Although a motion to compel usually precedes the imposition of Rule 37(b) sanctions, a formal motion is not always necessary. In general, where a party has received adequate notice that certain discovery proceedings are to occur by a specific date, and that party fails to comply, a court may impose sanctions without a formal motion to compel the discovery from the opposing party." Tamari, 729 F.2d at 472 (citing, inter alia, Charter House Ins. Brokers, Ltd. v. New Hampshire Ins. Co., 667 F.2d 600, 604 (7th Cir. 1981)). In effect, we treated Mr. Cordero's comments at the September 12 status hearing as an oral motion to compel, and we ordered Interline to produce all outstanding discovery. During that hearing, Mr. Callahan did not raise any of the issues that Interline now raises. He did not express any confusion, as he later did in the October 5 letter, about what discovery had been sought or what was outstanding. He did not dispute Mr. Cordero's representation that several months earlier, Interline had promised Craftwood complete supplemental responses to document requests and interrogatories, or the broader proposition that Interline owed Craftwood outstanding

discovery. And he did not assert that no supplemental discovery was owing to Craftwood.

Nothing that *the parties* said on September 12 about the possibility of future discovery motions undermined *our* order that Interline was to produce all outstanding discovery owing to Craftwood no later than October 12. That was an order, and it was not ambiguous. We had not said, "[s]ee if you can't work these things out," as Mr. Callahan represented at the November 7 hearing. Interline had adequate notice--provided both in court and in our written order--that it was to produce outstanding discovery by that date, yet Interline produced *nothing* between September 12 and October 12. Interline disobeyed our order.

The next question is whether it acted with willfulness, bad faith, or fault. Interline attempts to justify its disobedience by arguing that "[a]s of October 12, 2012, Interline had, in fact, provided 'all outstanding discovery' to Plaintiff based on its good faith understanding of this Court's directive," Def.'s Resp. at 12, which was that Interline was "to supply outstanding discovery *not objected to by Interline*, so that this Court could address (via a motion to compel) any remaining disputes about the nature and scope of discovery between the parties," Def.'s Resp. at 17. That explanation does not hold water, especially considering that on September 12, Mr. Callahan did not dispute that Interline owed Craftwood at least some outstanding supplemental discovery and that

defense counsel had indicated for several months that they were aware of and were working on producing the discovery that was owing to Craftwood. Moreover, as Craftwood points out, Interline failed to produce certain items of discovery to which it had never objected. (Pl.'s Reply at 14.)

The Court of Appeals confronted a similar situation in <u>Charter House</u>, 667 F.2d 600. The lower court had dismissed the suit as a sanction for plaintiff Charter House's refusal to comply with discovery requests that it had promised in open court to turn over within a ten-day period. Some material had been produced, but it became evident that the production had not been complete. Plaintiff sought to justify its non-production on several grounds that had not been raised in a timely fashion; instead, plaintiff "relied on its unilateral ability to construe and interpret the requests for production." 667 F.2d at 603. The Seventh Circuit treated plaintiff's counsel's promise as the equivalent of a court order and held that the trial court had been justified in imposing sanctions. It also upheld the trial court's choice of dismissal as a sanction for willful conduct, explaining as follows:

> Charter House . . . insists that its conduct was not willful, because it believed in good faith that the requests to produce did not cover a great many of the documents in this case. But Charter House was not entitled to rely on its interpretation. It should have sought the court's interpretation, either by objecting to the requests in timely fashion or by applying for a protective order under Rule 26(c). Its failure to take either step obstructed both the district judge and the magistrate in the performance of their duties. Charter

House cannot be heard to justify its conduct on the basis
of self-inflicted misunderstanding.

667 F.2d at 605 (citation omitted). After we issued our September
12 discovery order, the onus was on Interline to seek relief from
this court if it believed that it was not required to produce the
outstanding discovery.

At the very least, we can find fault because it was
unreasonable for Interline to put its own gloss on our order and
then fail to produce any supplemental discovery by October 12
without seeking some kind of protective order. But we believe,
given all the circumstances, that Interline acted willfully and in
bad faith. In its briefs, it attempts to shift the focus to the
discovery that it *has* produced, but it does not dispute the
discovery timeline as described by Craftwood's counsel. We find it
very troubling that Messrs. Callahan and Murphy *repeatedly ignored*
communications from Messrs. Zimmermann and Cordero that requested
the supplemental discovery. If defense counsel had valid
objections to the discovery requests, they should have raised them
by responding substantively to the multitude of e-mails from
plaintiff's counsel. In the same vein, Interline in its current
briefs ignores its refusal to cooperate and even accuses Craftwood
of being difficult. Interline contends that it "has been engaging
in efforts to come up with a reasonable solution to th[e] problem"
of plaintiff's allegedly overbroad discovery requests, Def.'s Resp.
at 11, but that prior to the October 12 discovery-production

deadline, plaintiff had "refused to provide any guidance to
Interline on what discrete issues they believed were
'outstanding,'" Def.'s Resp. at 17-18. These arguments are
disingenuous. We agree with the statement in Mr. Cordero's October
5 letter that Craftwood had "made abundantly clear precisely what
discovery" it was requesting, and it had done so repeatedly. Mr.
Cordero went so far as to enclose with that letter copies of prior
discovery communications with annotations that explained the
current status, in the event that there was still any uncertainty,
but he also explained that "[i]n the vast majority of instances
there has been no change [since the request was originally made]
because Defendants have neither provided the discovery nor
explained that they are unable to do so." (Cordero Decl., Ex. 33,
at 4.) We can only conclude, reluctantly, that the confusion Mr.
Callahan expressed in his October 5 letter was feigned.

Interline's recalcitrance is demonstrated in its briefs. It
continues to mischaracterize Craftwood's discovery demands as
"vague," in the face of clear evidence to the contrary. It
characterizes its own months-long failure to provide verifications
of its discovery responses as a "technical shortcoming"[7] that has

_____

[2] The parties' discussion about the lack of verified responses occurs in
relation to plaintiff's request for sanctions under Rule 37(d) for the failure
to serve responses to interrogatories. We are imposing sanctions under Rule
37(b) for Interline's violation of our order, so we find it unnecessary to
address the imposition of sanctions under Rule 37(d). We mention Interline's
argument concerning verification as part of our consideration of the totality of
the circumstances and to illustrate Interline's attitude toward its discovery
obligations.

been remedied. (Def.'s Resp. at 19.) Interline also claims that it has produced materials "showing" a fax recipient's "name," Def.'s Resp. at 2 n.1, citing in support of that argument paragraph 10 of Mr. Murphy's declaration. In paragraph 10, Mr. Murphy states that "[i]n many cases," the fax lists that Interline produced "contained information ranging from the Interline account number for the customer associated with the fax number to a full blown listing" of information about the customer, "including name." But he fails to attach any materials from which we can conclude that Interline actually identified a significant number of its customers or those who had given it permission to send faxes, *by name*.

Interline also presents argument concerning its customer databases. It states that it "does not believe production of its customer databases is warranted given the sensitivity of these records, the considerable size of these records, the fact that these records will include significant volumes of irrelevant materials, and the host of complex logistical issues associated with producing three separate customer databases to Plaintiff's counsel in a us[]able format." (Def.'s Surreply at 7.) Perhaps Interline has a point regarding the burdensome nature of identifying each and every one of its customers, and an identification of a sampling of them might have been sufficient. But instead of asking us for a ruling on the possibility of providing a sampling, which Interline had ample opportunity to do,

it stonewalled Craftwood and defied our order. The time for Interline to make its burdensomeness arguments was before October 12, 2012. It failed to do so, and it failed to produce any supplemental discovery at all until weeks after that date.

The final issue is what sanction we should impose for Interline's willful disobedience of our September 12 order. We are not required to select the least severe sanction, but we must select one that "a reasonable jurist, apprised of all the circumstances, would have chosen as proportionate to the infraction." In re Golant, 239 F.3d 931, 937 (7th Cir. 2001) (citing, inter alia, Melendez, 79 F.3d at 672). Craftwood asks us to preclude Interline from asserting any PEP or EBR defense, from "offering evidence in opposition to" plaintiff's anticipated motion for class certification, and from "asserting any contentions based on communications about the lawsuit with putative class members." (Pl.'s Mem. in Supp. of Mot. at 21.)

Rule 37(b)(2)(A)(ii) permits us to prohibit a party "from supporting . . . designated defenses, or from introducing designated matters in evidence" as a sanction for failing to obey a discovery order. Would such an order be proportionate "to the circumstances surrounding [Interline's] failure to comply with" our order? See Melendez, 79 F.3d at 672. Craftwood asserts that Interline's violation of our order was sufficiently serious to warrant the preclusion order it seeks. It also argues that such an

order would be "directly tailored" to Interline's violations because Interline had more than a year to produce evidence supporting a PEP or EBR defense, but continually failed to identify, through proper interrogatory or document-request responses, those with whom it had an EBR or from whom it had received PEP. (Pl.'s Mem. in Supp. of Mot. at 19.)

Interline contends that an order precluding it from presenting PEP and EBR defenses would be an extreme sanction and "would, in essence, result in a directed finding in favor of Craftwood on class certification." (Def.'s Resp. at 19.) Craftwood does not dispute that a preclusion order would leave Interline without a basis for opposing class certification, but notes that this result is of Interline's own making. We agree. The sanction is harsh but warranted. It was egregious and willful misconduct for Interline to ignore our production order, especially after having been notified by Craftwood numerous times over a period of months as to precisely which discovery requests were outstanding. Interline professes a need for "guidance" from the court "about what individualized inquiries Interline should be required to conduct on EBR and PEP for purported class members," Def.'s Resp. at 20, but it never requested such guidance before its deadline for producing outstanding discovery or before Craftwood filed its sanctions motion. What is more, Interline and its attorneys have displayed a cavalier attitude toward the judicial process, expressed even in

their briefs on the current motion. Interline was engaged in a pattern of stonewalling Craftwood whenever Craftwood requested the supplemental discovery that had been promised. Interline's counsel simply ignored several communications from Craftwood's counsel and on other occasions promised to respond and failed to follow through, or followed through only partially and after an unnecessary period of delay.

Therefore, we do not believe that less drastic sanctions, such as monetary sanctions, would suffice in this instance. Interline and its counsel's willful misconduct requires a sanction that has a prospect of deterring similar future misconduct. The only effective sanction would be the the preclusion of Interline's assertion of PEP and EBR defenses and the preclusion of its introduction of evidence concerning PEP and EBR. This sanction is tailored to Interline's violation because the main thrust of the outstanding discovery it refused to produce and repeatedly failed to substantively address was the identification of fax recipients with respect to whom Interline had PEP or an EBR. We can infer from Interline's argument that it does not anticipate presenting any other arguments in opposition to class certification, but we will not preclude it from offering other defenses or types of evidence; plaintiff's request that we bar the introduction of *any* evidence in opposition to class certification is overbroad.

- 32 -

## CONCLUSION

For the reasons explained above, the motion of plaintiff, Craftwood Lumber Company, for discovery sanctions pursuant to Federal Rule of Civil Procedure 37(b)(2)(A)(ii) [39] is granted. Interline is precluded from asserting PEP and EBR defenses and from introducing evidence concerning PEP and EBR. Pursuant to Federal Rule of Civil Procedure 37(b)(2)(C), we further order that Interline and its counsel, Messrs. Murphy and Callahan, pay the reasonable expenses, including reasonable attorneys' fees, incurred by Craftwood in filing and briefing the motion for sanctions. The parties shall follow the procedures set forth in Local Rule 54.3 in an effort to reach agreement on an appropriate amount. Defendants' motion to strike portions of plaintiff's reply and supporting materials [46] is denied.

A status hearing is set for September 4, 2013 at 10:30 a.m. to discuss the next steps in this case.

DATE:         August 29, 2013

ENTER:         _____

John F. Grady, United States District Judge