**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CRAFTWOOD LUMBER COMPANY,　　　　) | |
| 　　　　　　　　　　　　　　　　　) | |
| 　　　　Plaintiff,　　　　　　　) | |
| 　　　　　　　　　　　　　　　　　) | |
| 　　　　v.　　　　　　　　　　　) | No. 11 C 4462 |
| 　　　　　　　　　　　　　　　　　) | |
| INTERLINE BRANDS, INC., a Delaware ) | |
| corporation, and INTERLINE　　　) | |
| BRANDS, INC., a New Jersey　　　) | |
| corporation,　　　　　　　　　　) | |
| 　　　　　　　　　　　　　　　　　) | |
| 　　　　Defendants.　　　　　　　) | |

**MEMORANDUM OPINION**

The issue before the court is whether the parties have entered into an enforceable agreement to settle this putative class action. For the reasons explained below, the court holds that there is no enforceable settlement agreement.

**BACKGROUND**

Plaintiff, Craftwood Lumber Company ("Craftwood"), brought this putative class action alleging that Interline[1] violated the Telephone Consumer Protection Act of 1991 (the "TCPA"), 47 U.S.C. § 227, by sending at least 1,500 advertisements in at least 735,000 facsimile transmissions, some of which were received by Craftwood. The faxes advertised Interline's products.

---

[1]    There are two defendants--Interline Brands, Inc., a Delaware corporation, and Interline Brands, Inc., a New Jersey corporation--but they are affiliated, and the parties and the court have treated them throughout this litigation as a single entity that the court will call "Interline."

On August 29, 2013, the court entered an order granting Craftwood's motion for discovery sanctions pursuant to Federal Rule of Civil Procedure 37(b)(2)(A)(ii) and precluding Interline from asserting and introducing evidence concerning "prior express invitation or permission" and "established business relationship" defenses. Pursuant to Federal Rule of Civil Procedure 37(b)(2)(C), the court further ordered that Interline and its counsel pay the reasonable expenses, including reasonable attorneys' fees, incurred by Craftwood in filing and briefing the motion for sanctions.

The parties then attempted to settle the case through mediation. On October 11, 2013, the parties participated in a one-day session in California with a private mediator, Antonio Piazza. Before mediation began, the parties and counsel signed a written Confidentiality Agreement. At the end of the session, the parties and counsel signed a one-page document titled "Term Sheet," which is quoted below. In the weeks thereafter, the parties attempted to negotiate a written settlement agreement. Their efforts were unsuccessful.

On November 20, 2013, the court held a status hearing at which Interline's counsel stated that the parties had entered into a settlement agreement and attempted to show the court a copy of the Term Sheet. Craftwood's counsel objected on the ground that it would be a violation of the Confidentiality Agreement to show the court the Term Sheet. The court gave Craftwood leave to file, and

took briefs on, a motion to bar Interline from introducing evidence in violation of the Confidentiality Agreement. In a memorandum opinion dated April 9, 2014, the court denied the motion. The parties then filed briefs on the issue currently before the court: whether there is sufficient evidence of an enforceable settlement agreement.[2]

## DISCUSSION

## A. Facts

### 1. The Mediation Session and Term Sheet

The parties have submitted a number of declarations describing what occurred during their mediation session. Craftwood has submitted the declarations of its outside counsel C. Darryl Cordero and Scott Z. Zimmermann. Interline has submitted the declarations of its outside counsel, Bart T. Murphy; its former outside counsel, David K. Callahan; and its Chairman and CEO, Michael J. Grebe. All of the declarants were present for the mediation.[3] Several aspects of what occurred and what the participants discussed that day remain in dispute (and are ultimately immaterial to this ruling), but the following facts are not disputed except where noted.

---

[2] The parties filed cross-briefs, cross-responses, and cross-replies.

[3] Also present at the mediation were Craftwood's CEO, David Brunjes, and its outside counsel Frank Owen and James Payne, as well as Interline's general counsel, Michael Agliata, and outside counsel Andrew Clubok.

The mediation began at about 9:00 a.m. on October 11, 2013 with a two-hour joint session, during which each side presented its view of liability and damages.  After the joint session, the parties were divided into separate conference rooms, where each side alternatively met with the mediator.  The parties' "teams" spent most of the remainder of the day in separate sessions with the mediator discussing the possible structure and terms of settlement.  In one instance,[4] around noon, the parties' outside counsel met jointly with the mediator to discuss Interline's argument that it had mooted the case by making a "pick-off" settlement offer to Craftwood individually and the likelihood that this argument would be successful.

For most of the day, the parties made little progress. According to Mr. Callahan, shortly after 6:00 p.m., the mediator, Mr. Piazza, "made a mediator's proposal" to Interline "based on the parties' discussions to date, whereby the parties would resolve the case with a total potential class award of $60 million, but on a 'claims-made' (rather than 'common fund') basis."  (Def.'s Resp.,

---

[4] Interline's counsel refers to "meetings," plural, of "outside counsel only."  (Def.'s Resp., Ex. A, First Decl. of David K. Callahan ¶ 15.) Craftwood's counsel insist that there was only one such meeting and that they discussed nothing but Interline's mootness defense.  (Pl.'s Reply, Ex. 4, Supplemental Decl. of Scott Z. Zimmermann ¶ 3; Ex. 2, Supplemental Decl. of C. Darryl Cordero ¶ 6.)

Ex. A, First Decl. of David K. Callahan ¶ 22.)[5]  Mr. Piazza also suggested that class counsel receive $8 million in fees and Interline bear the costs of settlement administration.  Interline "agreed in concept" to Mr. Piazza's oral proposal but wanted to add a few terms of its own, such as a "blow-out" provision.  (Id. ¶ 23.)  The purpose of that provision, from Mr. Callahan's perspective, was "to protect [Interline] from an actual award approaching anywhere near $60 million, an amount which far exceeded Interline's valuation of this litigation."  (Id. ¶ 22.)

Mr. Callahan handwrote the initial version of the Term Sheet. The mediator did not write anything on the sheet at that time. (Id. ¶ 24.)  He took it to Craftwood's team to discuss it with them separately.  According to Mr. Cordero, Mr. Piazza stated that "he had drafted the sheet and would work hard to persuade [Interline] to accept it," but before doing so, "wanted Craftwood to 'buy in' to the sheet."  (Pl.'s Br., Ex. 1, Decl. of C. Darryl Cordero ¶ 11.)  Craftwood's team suggested a few changes and additions, which were written onto the Term Sheet.  Mr. Piazza then took the Term Sheet back to Interline's team.  Mr. Grebe initialed Craftwood's changes and signed the Term Sheet on behalf of Interline.  Mr. Piazza took the Term Sheet to Craftwood.  Mr. Brunjes and

---

[5]/ Craftwood has raised a host of evidentiary objections to Interline's declarations.  To illustrate generally how the Term Sheet came about and how the mediation was conducted, the court includes some of the statements to which Interline objects.  In light of the court's ruling, Craftwood's objections are moot.

Craftwood's counsel initialed Craftwood's changes; Mr. Brunjes signed it on behalf of Craftwood; and counsel for Craftwood also signed it and added the phrase "as counsel." The mediator provided the parties with copies of the signed Term Sheet.

The Term Sheet states as follows, with Craftwood's additions and modifications in bold:

<u>**TERM SHEET**</u>

1.  Claims made structure for all fax recipients within statute of limitations.

2.  Total class award: $60 million

3.  Blow-out provision @ 20% **of recipients**

4.  Attorneys' fee award: $8 million (in addition to total class award)

5.  Confidential until ~~filed with~~ mutually agreed.

6.  Vacatur of 8/29/13 order; will agree to payment of reasonable fee**s to be decided by Magistrate Kim.**

7.  Compensation/Incentive award to Craftwood of $**2**5,000.00[6]

8.  Notice/Administration fees paid by Interline, **including notice database.**

9.  Ordinary additional settlement terms; disputes resolved by mediator

10. **Rule 73 reference to Magistrate Judge Kim for all further proceedings in case.**

(First Callahan Decl., Ex. 1.) The parties never directly discussed the Term Sheet that day. After they executed it, the

---

[6] Craftwood changed this figure from $15,000.00 to $25,000.00.

"teams" reconvened to shake hands and left shortly thereafter. The parties did not discuss settlement any further before leaving.

## 2. Post-Mediation Negotiations

In the course of negotiating a written settlement agreement, the parties' already-strained relationship soured. On October 17, 2013, Mr. Cordero e-mailed a draft settlement agreement to Mr. Callahan, stating:

> Attached is our draft settlement agreement. The term sheet permits Plaintiff to determine the per-claim amount and related terms. Our initial thinking was to fix the per-transmission amount at $1,500. After forwarding and discussing paragraphs 5 and 6 [titled "Settlement Fund" and "Monetary Class Relief"] with Mr. Piazza, however, we cut that to $750 per transmission. Mr. Piazza believes that amount and other terms of those paragraphs are consistent with our agreement.
>
> I will separately forward the draft claim form. We will forward the other exhibits once the agreement is finalized.

(First Callahan Decl., Ex. 5.)

On October 18, 2013, the parties contacted chambers staff to jointly request a continuation of the October 23 status hearing, which the court granted. The parties did not inform chambers staff that they had reached a settlement at that point, so the court's minute order of October 21, 2013 states: "At the request of the parties, the status hearing set for October 23, 2013 is canceled and reset to November 20, 2013 at 10:30 a.m. to report on settlement efforts." (Docket No. 62.)

On October 23, 2013, a week after Craftwood sent its proposal to Interline, Mr. Callahan e-mailed Mr. Cordero a counterproposal, stating as follows:

> Attached is Defendants' draft settlement agreement; we may make some minor changes to the form, but wanted to get this to your review as soon as practicable. In light of the changes we made, we did not feel that a redline would be particularly helpful for your review, although we are happy to generate one if you would like. Let's try and have an initial discussion about how to move this to finalization on Thursday. . . .

(First Cordero Decl., Ex. B.) Interline's proposed agreement differed from Craftwood's in many respects, the most significant being the settlement amount per claim. Interline proposed a recovery of $72.53 for each fax transmission, about a tenth of the amount Craftwood had proposed.

The parties subsequently had numerous conversations and e-mail exchanges with each other and with the mediator. On November 15, Mr. Callahan e-mailed Craftwood to propose a structure whereby class members would receive $400 for the first fax sent, $200 for a second fax, and $100 for a third fax, with no additional compensation beyond a third fax. Mr. Callahan also stated that Interline was "open to any other combination along the same lines as long as it is consistent with the parties' written term sheet." (First Cordero Decl., Ex. C.) Craftwood rejected the proposal, and the parties ultimately were unable to reach a written agreement. At the November 20, 2013 status hearing, Mr. Callahan informed the

court that the parties had a final settlement as embodied in the Term Sheet, while Mr. Cordero disagreed.

**B.   Legal Standards**

   **1.   Federal Procedural Law**

   A district court has the power to enforce a settlement agreement in a case pending before it. Wilson v. Wilson, 46 F.3d 660, 664 (7th Cir. 1995). When the material facts are not in dispute, "the question whether a contract has come into being is one of law." Gutta v. Standard Select Trust Ins. Plans, 530 F.3d 614, 618 (7th Cir. 2008). If there are disputed material facts, the district court should hold an evidentiary hearing. Wilson, 46 F.3d at 664; see also Sims-Madison v. Inland Paperboard & Packaging, Inc., 379 F.3d 445, 449 (7th Cir. 2004). Where the record points to only one conclusion, however, the court need not hold a hearing. Gutta, 530 F.3d at 618.

   **2.   State Substantive Law**

   "A settlement agreement is a contract and as such, the construction and enforcement of settlement agreements are governed by principles of local law applicable to contracts generally." Gutta, 530 F.3d at 618 (quoting Laserage Tech. Corp. v. Laserage Labs., Inc., 972 F.2d 799, 802 (7th Cir. 1992)); Pohl v. United Airlines, Inc., 213 F.3d 336, 338 (7th Cir. 2000). But see Lewis v. Sch. Dist. No. 70, 648 F.3d 484, 486 n.1 (7th Cir. 2011) ("Whether a settlement agreement is binding is an issue governed by

the law of the state in which the parties executed the agreement.").   Neither party argues that California law applies. Interline relies on Illinois law, without objection from Craftwood, so the court will apply Illinois law.[7]

"Illinois conditions the enforceability of a putative contract on two predicates: a sufficiently concrete expression of the essential terms of the agreement, as well as an intent to be bound by that agreement."  Ocean Atl. Dev. Corp. v. Aurora Christian Schs., Inc., 322 F.3d 983, 995 (7th Cir. 2003) (citing, inter alia, Academy Chicago Publishers v. Cheever, 578 N.E.2d 981, 983 (Ill. 1991) and Morey v. Hoffman, 145 N.E.2d 644, 647-48 (Ill. 1957)); Abbott Labs. v. Alpha Therapeutic Corp., 164 F.3d 385, 387 (7th Cir. 1999) ("Under Illinois contract law, a binding agreement requires a meeting of the minds or mutual assent as to all material terms.").   "A contract is enforceable under Illinois law if from its plain terms it is ascertainable what each party has agreed to

---

[7]  In its opening brief, Craftwood contends incorrectly that the enforceability of any alleged agreement is governed by federal law, citing Seventh Circuit decisions issued in 1977 and 1986.  Those decisions are no longer good law on this issue.  Craftwood fails to acknowledge Dillard v. Starcon International, Inc., 483 F.3d 502, 506 (7th Cir. 2007), in which the Seventh Circuit quoted Lynch, Inc. v. SamataMason Inc., 279 F.3d 487, 490 (7th Cir. 2002), as having "noted that there has been 'uncertainty' in circuit case law 'over whether state or federal law would govern a suit to enforce a settlement of a federal suit' but that the uncertainty 'has been dispelled; it is state law.'" Interline argues for the application of Illinois law, citing Dillard in its opening and response briefs.  Craftwood fails to respond to Interline's choice-of-law argument, and at times it cites Illinois law and federal decisions applying Illinois law.  The court can consider Craftwood's failure to address the choice-of-law issue to be a waiver.  See, e.g., GATX Leasing Corp. v. Nat'l Union Fire Ins. Co., 64 F.3d 1112, 1115 n.6 (7th Cir. 1995).  Moreover, courts "do not worry about conflict of laws unless the parties disagree on which state's law applies."  Citadel Group Ltd. v. Wash. Reg'l Med. Ctr., 692 F.3d 580, 587 n.1 (7th Cir. 2012).

do.  A contract may be enforced even though some contract terms may
be missing or left to be agreed upon, but if the essential terms
are so uncertain that there is no basis for deciding whether the
agreement has been kept or broken, there is no contract." Wigod v.
Wells Fargo Bank, N.A., 673 F.3d 547, 564 (7th Cir. 2012) (citing
Cheever, 578 N.E.2d at 983-84).

"Illinois follows the objective theory of intent, whereby the
court looks first to the written agreement and not to the parties'
subjective understandings." Hampton v. Ford Motor Co., 561 F.3d
709, 714 (7th Cir. 2009). "Secret hopes and wishes count for
nothing.  The status of a document as a contract depends on what
the parties express to each other and to the world, not on what
they keep to themselves." Newkirk v. Vill. of Steger, 536 F.3d
771, 774 (7th Cir. 2008); see also Laserage, 972 F.2d at 802
(whether there was a "meeting of the minds" is determined by
looking at the parties' conduct and what they expressed to each
other).  The Seventh Circuit has observed:

> [I]t is a common commercial practice for two negotiating
> parties to sign a letter of intent or an agreement in
> principal, signaling that they have come to a tentative
> agreement on the general outlines of a deal without
> having nailed down all of the details.  Not infrequently,
> the negotiations that follow the execution of this
> document break down, prompting the disappointed party to
> sue on the theory that the preliminary document is
> binding.  Whether in fact the writing reflects a binding
> agreement between the parties . . . turns not on what the
> parties subjectively believed, but on what they expressly
> manifested in their writing. . . . [A] letter of intent
> or a similar preliminary writing that reflects a
> tentative agreement contingent upon the successful

        completion of negotiations that are ongoing does not
        amount to a contract that binds the parties.

Ocean Atlantic, 322 F.3d at 995-96 (citations omitted). To
determine whether there was a binding contract, the court must
examine the parties' writing to see whether it "include[s] all
terms essential to the deal and manifest[s] the parties' mutual
intent to be bound by those terms." Id. at 996. Furthermore,
"[t]he burden of proving the existence of a settlement agreement
rests upon the party seeking to enforce it." Kemp v.
Bridgestone/Firestone, Inc., 625 N.E.2d 905, 909 (Ill. App. Ct.
1993).

**C.   Analysis**

     **1.   The Term Sheet Did Not Include All Material Terms**

     First, the court examines whether the parties' writing
included all material terms. The Term Sheet fails to include
several terms that are material to a class action settlement. The
most glaring omission is the amount per claim--what Interline would
pay each fax recipient or for each fax transmission. The court
cannot ascertain from the Term Sheet what Interline agreed to pay.
The two decisions that Interline cites for the proposition that "a
settlement need not identify the proportion of the total amount
that would go to each plaintiff," Def.'s Br. at 9, are
distinguishable. Neither case was a class action. Moreover, the
total amount that defendants would be obligated to pay to settle

each case was clear.  In <u>Elustra v. Mineo</u>, 595 F.3d 699, 709 (7th Cir. 2010), the defendants had agreed to pay $6,000 to the two plaintiffs, who were mother and daughter, in exchange for their dismissal of the suit.[8]  In the other decision Interline cites, <u>Ice Glass Prints Fla., LLC v. Surprize LLC</u>, No. 08 CV 5284, 2010 WL 1702195 (N.D. Ill. 2010), the parties had agreed on all material terms, including that no party would make any financial payment on any claims made by any party to the case.  <u>Id.</u> at *5.

Interline concedes that the parties did not reach agreement on the claim amount, but it contends that the omission does not render the Term Sheet unenforceable because there need only be a reasonable standard for determining that term, and the parties "explicitly agreed to other provisions that provide a reasonable basis for determining each class member's share."  (Def.'s Br. at 9.)  Those provisions, according to Interline, are the "claims made structure"; the $60 million "total class award"; the "blow-out provision at twenty percent of recipients";[9] and "ordinary additional settlement terms; disputes [to be] resolved by [the] mediator."  Interline argues that in a "claims made" settlement, "a defendant agrees to a total class award but is likely to pay only

---

[8] <u>Elustra</u> was a civil rights case for false imprisonment in which the plaintiffs, a daughter and her mother who appeared as next friend for her other two daughters, demanded, and the parties negotiated, a global $6,000 settlement.

[9] It is undisputed that "blow-out provision" meant that if twenty percent or more of the fax-recipient class members made claims, Interline would have the right to rescind the settlement agreement.

a fraction of that total amount because proceeds are only distributed to class members filing claims[,] with the remainder reverting to the defendant." (Id. at 10.) Interline states that the Term Sheet gave Craftwood "limited discretion" to set the claim amount and that Interline "made clear" at the mediation that it "did not care" how Craftwood set the amount, as long as it fit within the Term Sheet's "agreed-upon parameters." (Def.'s Resp. at 12.)

The provisions upon which Interline relies are not true parameters because they are not specific enough to allow a court to reasonably imply the missing claim amount. The court cannot simply "derive [it] mathematically," as Interline submits. (Def.'s Resp. at 3.) The Term Sheet does not constitute a formula. Interline asserts that "the payment for each class member must be set at an amount such that if all of the approximately 100,000 members of the putative class file claims, then the total award will equal the $60 million total set forth in the Term Sheet," Def.'s Br. at 11, but Interline fails to present evidence that the parties so agreed. In addition, "while results vary from case to case depending on a number of factors, it is common that only a fraction of the class in class action settlements actually submit claims." Laguna v. Coverall N. Am., Inc., 753 F.3d 918, 933 (9th Cir. 2014) (Chen, J., dissenting). And, as Craftwood notes, "settlements commonly prescribe claim amounts that would collectively exceed the total

settlement payment if all class members filed claims," Pl.'s Reply at 10, and sometimes a total class award is exhausted by the claims that are filed by a minority of class members, Pl.'s Resp. at 12. The issue becomes even murkier considering Interline's argument that the parties expected the payout to be "much less" than $60 million because it was a not a common-fund settlement, Def.'s Reply at 2, and Mr. Callahan's statement that the $60 million "total class award" was "far in excess of what Interline was willing to pay" but had necessary "notional value" to justify the attorneys' fees award, Def.'s Reply, Ex. C, Second Decl. of David K. Callahan ¶ 18.

The parties disagree on what the term "claims made structure" means. Interline contends that it means that the total class award is not guaranteed, Interline's payout would depend on the number of claims made, and the unclaimed funds would revert to Interline. Craftwood, on the other hand, maintains that the term means "nothing more than [that] a class member must submit a timely proof of claim in order to participate in the distribution of settlement proceeds" and does not imply that any portion of the settlement funds revert to the defendant. (Pl.'s Resp. at 8.) In the court's view, the term is ambiguous as used in the Term Sheet. Craftwood relies on its literal meaning as a type of settlement structure, but Interline relies on the fact that the term is often used to include the concept that unclaimed funds revert to the defendant.

In any event, a hearing to ascertain the meaning of the term "claims made structure" is unnecessary because either way, the term still would not enable the court to derive the missing amount per claim. The total amount Interline would <u>actually</u> have to pay the class--or, at least the amount per claim, so that the estimated total amount or range could easily be calculated--is undoubtedly a material term of the settlement. The parties' subjective expectations likely lie somewhere in between the amounts they proposed to each other after the mediation; nonetheless, the court is not concerned with subjective expectations when the parties have failed to express them, and they did not agree on this amount or a way to calculate it.[10] The range of possibilities is broad--much too broad for the court to supply the term. Illinois law does not permit the court to write an agreement for the parties by selecting from among a wide range of possibilities. <u>See, e.g.</u>, <u>Ass'n Benefit Servs., Inc. v. Caremark Rx, Inc.</u>, 493 F.3d 841, 852 (7th Cir. 2007) (under Illinois law, when essential terms are so uncertain that there is no basis for deciding whether an agreement has been kept or broken, a court "ought not . . . supply missing terms when their pronounced absence in the original agreement demonstrates a lack of mutual assent and the absence of an enforceable contract at the outset").

---

[10] The parties also failed to specify whether the class members would be paid on a per-recipient or per-fax basis.

The gulf that separates the parties, as well as Interline's shifting post-mediation proposals, belies Interline's argument that the amount per claim was neither "controversial" nor "omitted." The court rejects Interline's contention that Craftwood, in making its $750-per-fax proposal, attempted to "unilaterally re-write (and strip all meaning from)" the Term Sheet. (Def.'s Resp. at 5.) There was little "meaning" there to begin with regarding Interline's payment obligations.

The fact that the Term Sheet included the phrase "ordinary additional settlement terms; disputes resolved by mediator" does not help Interline. The amount for which Interline would be on the hook is by no means an "ordinary" settlement term, and Interline has not submitted any evidence that the parties agreed that this phrase would encompass the claim amount. The mediator would be unable to supply the missing term for the same reasons that the court is unable to do so. Interline argues that "ordinary does not mean unimportant. It means usual or likely." (Def.'s Reply at 10.) But what is a "usual" claim amount in a junk-fax class action settlement? There is none. What did the parties "likely" mean? Interline is unable to say, except by repeatedly invoking the Term Sheet's purported "parameters." The court cannot reach a conclusion based on this assertion.

The Term Sheet also left other material terms unresolved. It does not contain any release terms, which the Seventh Circuit has

said are "inherently material" to a settlement agreement.  See
Alpha Therapeutic, 164 F.3d at 388.  Interline's contention that a
release is an "ordinary additional settlement term" that could be
supplied by the mediator is not persuasive.  See, e.g., Walker v.
Commercial Recovery Sys., Inc., No. 99 C 5512, 2000 WL 1810066, at
*2 (N.D. Ill. Dec. 7, 2000) (holding that there was no enforceable
oral settlement agreement where the parties "failed to include any
indication of any agreement on many of the terms that are a
necessary part of a class action settlement" and noting that the
scope of a release in a class action context "may be considerably
more complicated than a simple agreement by the named plaintiff to
dismiss her case").  Not surprisingly, post-mediation, Craftwood
and Interline could not agree on the scope of a release.[11]

Craftwood argues that the Term Sheet also lacks a settlement
class definition.  Interline asserts that it does contain one--"all
fax recipients within [the] statute of limitations."  Because the
parties omitted other material terms, the court need not decide
whether the parties agreed to this class definition, but notes that
post-mediation, Interline evidently did not believe that this was

_____

[11]/ The parties also disagreed about how Interline would fund the class
award; whether a claim would need to be postmarked or received by the claims-
submission deadline; the manner of class notice; whether Interline would be
permitted to dissuade class members from making claims; who would be the Claims
Administrator; whether Interline would be obligated to pay all costs of
administration or just "reasonable" costs; whether Interline would have
additional rights to cancel the settlement; how uncashed checks would be treated;
and whether the court would have continuing jurisdiction to enforce the
settlement agreement.  (Pl.'s Br., Ex. 2, Decl. of Scott Z. Zimmermann, Ex. L.)

the agreed-upon class definition.  In the October 23, 2013 draft settlement agreement it sent to Craftwood, Interline proposed a different, and narrower, definition--"all subscribers, as of May 10, 2007, of any telephone facsimile number to which Defendants or an entity acting on their behalf, successfully transmitted an Unsolicited Facsimile Advertisement during the period May 10, 2007[12] to the date of this Agreement."  (First Cordero Decl., Ex. B, at 7.)  In Craftwood's view, this definition created potential difficulties because Interline had not conceded that all of the faxes were unsolicited and the definition unfairly excluded those who had received solicited faxes from Interline that violated the TCPA's opt-out notice requirements.

### 2.  **The Parties' Intent**

It is not clear whether the parties intended to be bound by the Term Sheet.  The Term Sheet does not contain any language indicating whether the parties so intended or conditioning an agreement on the execution of a formal contract.[13]  Interline heavily emphasizes that Craftwood made edits to the Term Sheet, the parties and counsel signed the Term Sheet and initialed Craftwood's edits, and the opposing sides shook hands and exchanged

---

[12] Interline states that this date reflects the four-year statute of limitations.  (Def.'s Resp. at 14 n.8.)  This case was filed on May 10, 2011.

[13] "[J]ust as language anticipating the execution of a final contract does not rule out the possibility that the parties intended for their preliminary writing to bind them, neither does the absence of a 'subject to' clause carry talismanic significance."  Ocean Atlantic, 322 F.3d at 999 (citations omitted).

congratulations at the end of the mediation session. Those factors, however, could also be evidence of a preliminary "agreement to agree," and in any event were fruitless where, as here, the parties' writing failed to include all material terms. The omission of those material terms suggests that the parties intended to establish boundaries rather than a final agreement. See Ocean Atlantic, 322 F.3d at 999 ("[C]ontracting parties can and often do approach agreement by stages . . . . "). But even if the parties mutually intended that the Term Sheet be binding, it is simply too vague to be enforced. See Cheever, 578 N.E.2d at 983 (even if "the parties may have had and manifested the intent to make a contract, if the content of their agreement is unduly uncertain and indefinite, no contract is formed"). At the end of a long day and at the mediator's suggestion, the parties hastily-- and separately!--cobbled together the Term Sheet. They did not discuss its terms, its omitted terms, or the meanings of its phrases with each other, but separately only with the mediator.[14] Even if they mutually intended to walk out of the session with a final settlement agreement, they failed to get the job done.

---

[14]/ Mr. Cordero states that when the mediator presented him and Mr. Zimmermann with the Term Sheet, counsel noted that it "did not address how each settling class member's claim would be calculated," and when they "raised the issue with [the] mediator," the mediator said that "the structure allowed Craftwood, in the formal class settlement agreement, to determine in its discretion how the award would be divided among the settling class members." (First Cordero Decl. ¶ 12.) The court need not delve further into the separate conversations that the parties had with the mediator because it is clear that they had never discussed the issue between themselves or otherwise come to a mutual understanding on the amount or how it would be calculated. Furthermore, the Term Sheet fails to include anything about it.

The parties' communications with court staff a week after the mediation session further suggest that neither side believed at the time that the parties had reached a binding settlement agreement. It is the court's experience that when parties have reached a settlement agreement, they will so notify chambers staff in short order, or they will represent that they have reached a settlement in principal, and either request a dismissal or some time to "finalize the papers" or "memorialize" the settlement. That is not what happened in October 2013. Instead, the parties requested additional time to reach a settlement.

Mr. Callahan states in one of his declarations that "Interline was only willing to agree to the contemplated settlement if it served as a final resolution of Craftwood's claims. To that end, I drafted a provision stating unambiguously that as to any terms of the settlement agreement not explicitly provided on the Term Sheet, 'ordinary additional settlement terms' would apply and any 'disputes' regarding the same would be 'resolved by the mediator.'" (First Callahan Decl. ¶ 23.) The Term Sheet, however, does not state "unambiguously" or otherwise, or even imply, that it is a "final resolution." Its status as a "final resolution" is a classic example of a "secret hope and wish" that counts for nothing under Illinois law because it was not expressed by either party.

The Term Sheet is not an enforceable settlement agreement, and Interline has not submitted any evidence demonstrating that the

parties had an oral settlement agreement or agreed on how to fill the Term Sheet's material gaps.

## CONCLUSION

For the reasons explained above, the court holds that the parties did not enter into an enforceable settlement agreement. A status hearing is set for October 2, 2014 at 8:45 a.m.


DATE:          September 23, 2014


ENTER:     _____

           Amy J. St. Eve, United States District Judge