**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CRAFTWOOD LUMBER COMPANY, an Illinois corporation, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 11-cv-4462 |
| INTERLINE BRANDS, Inc., et al., | ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Plaintiff Craftwood Lumber Company ("Craftwood" or "Plaintiff") has filed motions seeking attorney's fees and expenses [142] and an incentive fee award for Plaintiff as the class representative [143]. For the reasons explained below, the Court grants in part and denies in part Craftwood's motions.

**BACKGROUND**

Craftwood filed this case as a putative class action in 2011 against Defendants for alleged violations of the Telephone Consumer Protection Act ("TCPA"), as amended by the Junk Fax Prevention Act of 2005 ("JFPA"), codified at 47 U.S.C. § 227. Craftwood alleges that Defendants sent over 1,500 advertisements in at least 735,000 facsimile transmissions in violation of the JFPA and the regulations promulgated thereunder. (R. 36, Am. Compl., at 2.) Plaintiff originally brought this action in state court, and Defendants removed it to the Northern

1

District of Illinois where it was initially assigned to the Hon. John F. Grady.[1] After proceeding with discovery, Craftwood successfully sought sanctions against Defendants precluding them from asserting either a "prior express invitation or permission" ("PEP") or an "established business relationship" ("EBR") defense to Craftwood's junk fax claim. (R. 59.) After participating in several mediations and initially failing to agree to the terms of a written settlement agreement, the parties filed an executed settlement agreement with the Court on November 17, 2014. (R. 128.) On December 8, 2014, the Court entered an order conditionally certifying a class for the purposes of settlement, and granting preliminary approval to the parties' proposed settlement agreement. (R. 136.) Plaintiff has now moved for attorney's fees and expenses and an incentive fee award for Plaintiff as the class representative as part of the settlement. As they agreed in the settlement, Defendants do not object to either motion. (*See* R. 128, at 9.) The Court set a deadline of March 9, 2015 for class member objections to Plaintiff's motion for attorney's fees and costs, and Plaintiff's motion for the incentive fee award. (R. 136.) To date, no class members have filed objections.

## LEGAL STANDARD

"In a certified class action, the court may award reasonable attorney's fees … that are authorized by law or by the parties' agreement." Fed.R.Civ.P. 23(h). In determining a reasonable fee, "the judge must assess the value of the settlement to the class and the reasonableness of the agreed-upon attorneys' fees for class counsel, bearing in mind that the higher the fees the less compensation will be received by the class members." *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014). "[A]ttorneys' fees in class actions should approximate the market rate that prevails between willing buyers and willing sellers of legal services." *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 957 (7th Cir. 2013). To

---

[1] The Executive Committee transferred the case to this Court on January 5, 2015. (R. 140.)

determine the reasonableness of the sought-after fee in a common-fund case, "courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Mktg. Litig.,* 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid I*").

*Synthroid I* held that the "market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case." *Synthroid I*, 264 F.3d at 721. Because "[c]ontingent fees compensate lawyers for the risk of nonpayment," the probability of success at the outset of the litigation is important to this inquiry. *Silverman*, 739 F.3d at 958; *see Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 565 (7th Cir. 1994). The Seventh Circuit has further explained that a district court "'must set a fee by approximating the terms that would have been agreed to *ex ante*, had negotiations occurred.'" *Americana Art China Co., Inc. v. Foxfire Printing and Packaging, Inc.*, 743 F.3d 243, 246-47 (7th Cir. 2014) (quoting *Synthroid I*, 264 F.3d at 719.) The Seventh Circuit has nevertheless recognized, however, that "[s]uch estimation is inherently conjectural." *In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 744 (7th Cir. 2011).

With respect to incentive payments, the Seventh Circuit has explained that such "awards are justified when necessary to induce individuals to become named representatives." *Synthroid I,* 264 F.3d at 722. Thus, if such individuals "would have stepped forward without the lure of an 'incentive award,' there is no need for such additional compensation." *Id.* at 723. In deciding whether an incentive award is proper, and, if so, in what amount, "relevant factors include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class

3

has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook v. Niedert,* 142 F.3d 1004, 1016 (7th Cir. 1998).

Finally, the Federal Rules of Civil Procedure allow the Court, in a certified class action, to "award reasonable ... nontaxable costs that are authorized by law or by the parties' agreement." Fed.R.Civ.P. 23(h). The Seventh Circuit has explained that district courts must exercise their discretion to "disallow particular expenses that are unreasonable whether because excessive in amount or because they should not have been incurred at all." *Zabkowicz v. W. Bend Co., Div. of Dart Indus., Inc.,* 789 F.2d 540, 553 (7th Cir. 1986) (quoting *Henry v. Webermeier*, 738 F.2d 188, 192 (7th Cir. 1984)). "Reducing litigation expenses because they are higher than the private market would permit is fine; reducing them because the district judge thinks costs too high in general is not." *Synthroid I*, 264 F.3d at 722. "Likewise the amount of itemization and detail required is a question for the market. If counsel submit bills with the level of detail that paying clients find satisfactory, a federal court should not require more." *Id*.

## ANALYSIS

**I.  Attorney's Fees**

Plaintiff seeks the award of $12 million in attorney's fees for its counsel, which represents thirty percent of the common-fund of $40 million that Defendants agreed to pay in the settlement. Plaintiff argues that thirty percent is lower than the amount that would have been negotiated *ex ante* in a contingency fee agreement, and submits an expert declaration in support of this position. The expert's declaration states that a fee percentage of thirty percent is appropriate, in part because there have been many common-fund class action settlements where courts have awarded between 30 and 33 percent of the fund for attorney's fees. The declaration states further "that the market supports a larger award" than the thirty percent requested. (R.

142-5, Wallace Dec. ¶ 23.) In its brief in support of its motion, Plaintiff's counsel also submits two tables, one summarizing recent large class action settlements in the Northern District of Illinois, and the other listing recent TCPA attorney's fee awards in district courts within the Seventh Circuit. Plaintiff argues that both support its position that a flat attorney's fee of thirty percent is reasonable. As noted above, Defendants agreed in the settlement to not object to Plaintiff's request for attorney's fees, and no class members have filed objections.

While Plaintiff cites a number of cases in which courts have awarded similar percentages of attorney's fees to the percentage Plaintiff's counsel requests here, its motion fails to address that as the dollar value of a class action settlement increases, the percentage of the settlement awarded as attorney's fees generally decreases. In *Silverman v. Motorola Solutions, Inc.*, for example, the Seventh Circuit recently discussed this principle in depth:

> [N]egotiated fee agreements regularly provide for a recovery that increases at a decreasing rate…
>
> Many costs of litigation do not depend on the outcome; it is almost as expensive to conduct discovery in a $100 million case as in a $200 million case. Much of the expense must be devoted to determining liability, which does not depend on the amount of damages…There may be some marginal costs of bumping the recovery from $100 million to $200 million, but as a percentage of the incremental recovery these costs are bound to be low. It is accordingly hard to justify awarding counsel as much of the second hundred million as of the first. The justification for diminishing marginal rates applies to $50 million and $500 million cases too, not just to $200 million cases …
>
> Awarding counsel a decreasing percentage of the higher tiers of recovery enables them to recover the principal costs of litigation from the first bands of the award, while allowing the clients to reap more of the benefit at the margin (yet still preserving some incentive for lawyers to strive for these higher awards).

*Silverman*, 739 F.3d at 959.

A detailed 2010 study on attorney's fees in class action settlements (cited by *Silverman*) confirmed empirically that as the size of a settlement increases, the percentage of the total settlement awarded as attorney's fees tends to decrease. Theodore Eisenberg & Geoffrey P.

Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Studies 248 (2010). That study examined available opinions from 1993 through 2008 on settlements in class actions and shareholder derivative suits in state and federal court. It found that for settlements less than or equal to $1.1 million, the median attorney's fee percentage was 32.3% and the mean was 37.9%. *Id*. at 265. As the settlement value increased, however, the percentage of the attorney's fee awarded compared to the total settlement amount tended to decrease. For example, in settlements between $2.8 million and $5.3 million, the median attorney's fee percentage was 25% and the mean was 26.4%. *Id*. For settlements between $22.8 million and $38.3 million (i.e., the range just below the $40 million settlement at issue here), the study found the median attorney's fee percentage to be 24.9% and the mean to be 22.1%. *Id*. For settlement amounts between $38.3 million and $69.6 million, the median attorney's fee percentage was 21.9% and the mean was 20.5%. *Id*. In the highest range, settlements greater than $175.5 million, the median attorney's fee dropped all the way to 10.2% and the mean to 12%.

Another 2010 study cited by *Silverman* noted the same phenomenon. *See* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Studies 811 (2010); *Silverman*, 739 F.3d at 958. The Fitzpatrick study similarly found that for settlements ranging from $30 million to $72.5 million, the median attorney's fee percentage was 24.9%, and the mean was 22.3%. Fitzpatrick, *An Empirical Study of Class Action Settlements*, 7 J. Empirical Legal Studies at 839. Settlements in the lowest range of below $750,000 had higher attorney's fee percentages (median of 29.6% and a mean of 28.8%), and settlements in the highest range of $72.5 million to $6.6 billion had lower attorney's fee percentages (median of 19% and a mean of 18.4%). *Id*.

For these reasons, and given the high settlement amount in this case, instead of using Plaintiff's requested flat attorney's fee percentage of thirty percent, the Court instead looks to the more representative attorney's fee percentages in the Eisenberg & Miller and Fitzpatrick studies for settlement amounts with similar dollar values. It also looks to the Seventh Circuit's decision in *In re Synthroid Mktg. Ltg.*, 325 F.3d 974 (7th Cir. 2003) ("*Synthroid II*"). There, the Seventh Circuit awarded as attorney's fees 30% of the first $10 million of the settlement, 25% of the second $10 million, 22% of the common-fund amounts from $20 through $46 million, and 15% of the amounts over that up to the total amount of $88 million. *Id*. at 980; *see also Silverman*, 739 F.3d at 959 ("Our concern is less with the absolute level of fees than with the structure of the award. The articles we have cited reinforce the observation in the *Synthroid* opinions that negotiated fee agreements regularly provide for a recovery that increases at a decreasing rate.") The Court's decision to base its analysis on those figures is reinforced by the attorney's fee percentages cited by Plaintiff that district courts within the Seventh Circuit have awarded in TCPA cases. Plaintiff cites 56 instances in which district courts in the Seventh Circuit have awarded attorney's fees in TCPA class actions, and argues that in 50 of those 56 cases, courts awarded attorney's fees of at least thirty percent of the total settlement amount. Only one of those 56 cases, however, had a settlement amount of greater than $5 million, and the majority of the settlement totals were far smaller. The higher attorney's fee percentages in these cases make sense given the relatively smaller settlement amounts.

Using the above figures as a reference point, the Court turns to the specific facts of this case. The Seventh Circuit has instructed that the "market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case."

7

*Synthroid I*, 264 F.3d at 721. The Court examines these factors from an *ex ante* perspective, as if the class members and Plaintiff's counsel were negotiating a fee at the outset of the case. *See id.* With respect to the risk of nonpayment, the Court agrees with Plaintiff that this case posed some risks. At the outset, it was not apparent that Interline would have records sufficient for Plaintiff to prove that Interline had sent a large number of faxes in violation of the JFPA. There was also a risk that Interline would be able to show that fax recipients had consented to their receipt, or that Interline had an established business relationship ("EBR") with certain of the recipients. As a putative class action, Plaintiff also faced the risk that the Court would not certify the class, either because of these two defenses, or because of other potential class issues. Nevertheless, while there were some risks, the Court does not find that they were so great that they would have justified a higher contingency fee for Plaintiff's counsel at the commencement of the case.

With respect to the quality of Plaintiff's counsel's performance, the Court notes that it did not become involved in this case until shortly before settlement. Nevertheless, the work of Plaintiff's counsel that the Court has had the opportunity to assess has been of a high quality, commensurate with their several decades of class action experience, including as former lead counsel in several major class actions. (*See* R. 142-2, Zimmerman Dec., and R. 142-3, Cordero Dec.) Plaintiff's counsel also secured a significant victory when Judge Grady ruled that as a discovery sanction Defendants were precluded from asserting PEP or EBR defenses. As far as the amount of work necessary to resolve the litigation, Plaintiff's counsel fought to secure the written discovery it needed and took twelve depositions, but the case settled before contested class certification briefing, summary judgment, or trial. Viewed from an *ex ante* perspective, the plaintiff class and its prospective counsel may have expected the case to be more difficult to resolve, but it would have been reasonable to expect that it had a good chance of being settled

once the magnitude of any TCPA violations became clear in discovery. Finally, the Court does not find that the stakes of the case would impact the attorney's fee. The legal issues were not particularly unique, and although the settlement ended up being large because of the size of Defendants' potential TCPA liability, that contingency could have been addressed through a sliding-scale attorney's fee percentage that declined with the total amount of recovery.

For these reasons, the Court finds that, if given the opportunity, it is reasonable to assume that class members and Plaintiff's counsel would have bargained for a sliding-scale contingency fee resulting in a declining percentage of attorney's fees for Plaintiff's counsel as the total recovery increased. As the Seventh Circuit has noted, a sliding-scale contingency fee can properly incentivize counsel. *See Silverman*, 739 F.3d at 959 ("Awarding counsel a decreasing percentage of the higher tiers of recovery enables them to recover the principal costs of litigation from the first bands of the award, while allowing the clients to reap more of the benefit at the margin (yet still preserving some incentive for lawyers to strive for these higher awards).") The Court uses the Seventh Circuit's award of fees in *Synthroid II* as a starting point for fees in this case. *See Synthroid II*, 325 F.3d. at 980. Accordingly, the Court awards Plaintiff's counsel attorney's fees as follows: 30% of the first $10 million of the settlement, 25% of the second $10 million, and 20% of the remaining amounts from $20 to $40 million. This results in an overall attorney's fee award of $9.5 million, or 23.75% of the common fund of $40 million.[2]

The twenty percent that the Court awards for the settlement amounts from $20 through $40 million is a slight reduction from the 22% in *Synthroid II*, but the Court feels that it better

---

[2] As Plaintiff notes, the Seventh Circuit recently held that in calculating the attorney's fee percentage in a class action settlement a court should compare the attorney's fee with the total amount recovered by plaintiffs, exclusive of administrative costs. *See Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014). Based on Plaintiff's current estimate of $262,332.52 of administrative costs (*see* R. 146-2, Dang Dec. ¶ 22) and approximately $140,000 in litigation costs (*see* R. 145, Not. of Errata), an attorney's fee of $9.5 million would actually be closer to 24% of the total recovered by the class.

9

reflects the attorney's fees agreement that would have been reached *ex ante* based on the risks inherent in the case, the quality of counsel's performance, the likely amount of work necessary to resolve the litigation, and the potential stakes. While counsel performed well and secured a large recovery for the class, the case was not especially difficult or time consuming given the size of the recovery. In setting the overall fee award, the Court also considers the attorney's fee percentages that the Eisenberg & Miller and Fitzpatrick studies found for similar settlement amounts. The Eisenberg & Miller study found, for example, that for settlement amounts between $38.3 million and $69.6 million, the median attorney's fee percentage was 21.9% and the mean was 20.5%. Eisenberg & Miller, *Attorney Fees and Expenses in Class Action Settlements*, 7 J. Empirical Legal Studies at 265. The Fitzpatrick study found that for settlements ranging from $30 million to $72.5 million, the median attorney's fee percentage was 24.9% and the mean was 22.3%. Fitzpatrick, *An Empirical Study of Class Action Settlements*, 7 J. Empirical Legal Studies at 839. An overall attorney's fee percentage of approximately 24% is appropriate here.

As a final matter with respect to attorney's fees, Plaintiff's counsel correctly notes that a lodestar cross-check of the attorney's fees is not warranted. *See Americana Art China Co., Inc. v. Foxfire Printing and Packaging, Inc.*, 743 F.3d 243, 247 (7th Cir. 2014) (quoting *Florin*, 34 F.3d at 566 ("[W]e are of the opinion that both the lodestar approach and the percentage approach may be appropriate in determining attorney's fee awards, depending on the circumstances…The decision whether to use a percentage method or a lodestar method remains in the discretion of the district court.")) The Court does not have a concern with the percentage method over-compensating Plaintiff's counsel, and as discussed in detail above, finds the percentage fee awarded to be appropriate. *See id.* (citing *Harman v. Lyphomed, Inc.*, 945 F.2d

969, 974 (7th Cir. 1991) for the proposition that the lodestar method can alleviate "concerns that a percentage approach resulted in over-compensation for attorneys.")

## II. Class Representative Incentive Fee

Plaintiff Craftwood also seeks $25,000 as an incentive fee for serving as the class representative. Plaintiff argues that it has performed above and beyond what is expected of a typical class representative. Its President, David Brunjes, represents that he has spent nearly 200 hours working on this case. (R. 141-1, Brunjes Dec. at 5.) He investigated the claims, provided substantial assistance in responding to discovery, was deposed, attended two separate mediations in Chicago and San Francisco while assisting with a third, and regularly communicated with class counsel regarding case strategy. (*Id*. at 3-5.)

An incentive award of $25,000 is reasonable in this case. As discussed above, in deciding whether an incentive award is proper, and, if so, in what amount, "relevant factors include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook v. Niedert,* 142 F.3d 1004, 1016 (7th Cir. 1998). Further, "awards are justified when necessary to induce individuals to become named representatives." *Synthroid I*, 264 F.3d at 722. Here, after receiving only two faxes, Plaintiff's president spent several hundred hours working on this case, including attending two separate mediations and having his deposition taken. This led to the proposed $40 million settlement, which Plaintiff represents is the largest TCPA junk fax settlement in history. Under these circumstances, an incentive fee is appropriate. It rewards an individual entity for becoming a named representative where it suffered relatively little harm, but where its efforts ultimately led to a significant recovery for the class.

Further, an award of $25,000 is in line with incentive fees awarded by other courts in this district, and with the mean percentage of incentive fees awarded in class actions nationwide. In *American International Group, Inc. v. ACE INA Holdings, Inc.*, for example, the court awarded incentive fee awards of $25,000 to each of seven plaintiffs. *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, Nos. 07-CV-2898, 09-CV-2026, 2012 WL 651727, at *16 (N.D. Ill. Feb. 28, 2012). In *Cook v. Niedert*, the Seventh Circuit affirmed the grant of a $25,000 incentive fee award, in part because the named plaintiff's efforts spending hundreds of hours with his attorneys led to a cash recovery for the class of more than $13 million. *Cook*, 142 F.3d at 1016. Additionally, in *In re Southwest Airlines Voucher Litigation*, the court recently approved incentive awards of $15,000 for each of the two named plaintiffs where the value of the individual drink vouchers at issue were minimal, and the plaintiffs assisted with discovery, prepared for and sat for depositions, and consulted with class counsel on a regular basis. *In re Sw. Airlines Voucher Litig.*, No. 11-CV-8176, 2013 WL 4510197, at *11 (N.D. Ill. Aug. 26, 2013). Finally, a study on incentive awards for class action plaintiffs (also conducted by Eisenberg and Miller) found that the mean incentive fee award granted in consumer class actions is .08% of the total recovery, and the mean incentive fee granted in class actions overall is .161%. *See* Theodore Eisenberg & Geoffrey P. Miller, *Incentive Award to Class Action Plaintiffs: An Empirical Study*, 53 U.C.L.A. L.Rev. 1303, 1339 (2006). The $25,000 incentive fee awarded here would be approximately .06% of the close to $40 million total — very similar to the percentages found by Eisenberg and Miller. Thus, the Court grants Plaintiff's motion for a $25,000 class incentive fee.

### III. Costs and Expenses

As a final matter, Plaintiff's counsel moves for the reimbursement of $136,517.03 in expenses incurred during the litigation, in addition to additional expenses that will be incurred through the conclusion of the action, not to exceed $2,500. (*See* R. 145, Not. of Errata.) As discussed above, district courts must exercise their discretion to "disallow particular expenses that are unreasonable whether because excessive in amount or because they should not have been incurred at all." *Zabkowicz*, 789 F.2d at 553 (quotation omitted). The costs requested by Plaintiff's counsel are reasonable, and they document them with a sufficient level of detail. *See Synthroid I*, 264 F.3d at 722 ("If counsel submit bills with the level of detail that paying clients find satisfactory, a federal court should not require more.") Further, as Plaintiff notes, these expenses represent approximately 0.35 percent of the total class recovery, which is much less than the average percentage of expenses in class cases overall (4 percent) found by one empirical study. *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud. 27, 70 (2004) (noting that "[c]osts and expenses … were, on average, 4 percent of the relief for the class"). Accordingly, the Court grants in full Plaintiff's counsel's request for the reimbursement of expenses.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Plaintiff's motions.

**DATED: March 23, 2015**  **ENTERED**

*[signature]*

AMY J. STEEVE
U.S. District Court Judge