# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| CRAFTWOOD LUMBER COMPANY, an Illinois corporation, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 11-cv-4462 |
| INTERLINE BRANDS, Inc., et al., | ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Craftwood Lumber Company ("Craftwood" or "Plaintiff") has filed a motion requesting that the Court reconsider and amend [157] its March 23, 2015 memorandum opinion and order granting Craftwood's counsel $9.5 million in attorney's fees. For the following reasons, the Court denies Plaintiff's motion.

## BACKGROUND

Craftwood filed this case as a putative class action in 2011 against Defendants for alleged violations of the Telephone Consumer Protection Act ("TCPA"), as amended by the Junk Fax Prevention Act of 2005 ("JFPA"), codified at 47 U.S.C. § 227. Craftwood alleges that Defendants sent over 1,500 advertisements in at least 735,000 facsimile transmissions in violation of the JFPA and the regulations promulgated thereunder. (R. 36, Am. Compl., at 2.) Plaintiff originally brought this action in state court, and Defendants removed it to the Northern

1

District of Illinois where it was initially assigned to the Hon. John F. Grady.[1] After proceeding with discovery, Craftwood successfully sought sanctions against Defendants precluding them from asserting either a "prior express invitation or permission" ("PEP") or an "established business relationship" ("EBR") defense to Craftwood's junk fax claim. (R. 59.) After participating in several mediations and initially failing to agree to the terms of a written settlement agreement, the parties filed an executed settlement agreement with the Court on November 17, 2014. (R. 128.) On December 8, 2014, the Court entered an order conditionally certifying a class for the purposes of settlement, and granting preliminary approval to the parties' proposed settlement agreement. (R. 136.)

On February 13, 2015, Craftwood moved for the award of $12 million in attorney's fees for its counsel, which corresponded to 30 percent of the common settlement fund of $40 million. (R. 142.) As they agreed in the settlement, Defendants did not object. (*See* R. 128, at 9.) The Court set a deadline of March 9, 2015 for objections to Plaintiff's motion, and no class members filed objections. (R. 136.) On March 23, 2015, the Court issued an opinion (the "March 2015 Opinion") awarding Craftwood's counsel a sliding scale contingency fee as follows: 30 percent of the first $10 million of the settlement, 25 percent of the second $10 million, and 20 percent of the remaining amounts from $20 to $40 million. (R. 152.) This corresponded to $9.5 million of the $40 million common settlement, or 23.75 percent. (*Id.*) Craftwood now moves the Court under Federal Rule of Civil Procedure 59(e) for reconsideration of its opinion and to amend the award, requesting the remaining $2.5 million of the $12 million in attorney's fees that it originally sought. (R. 157.)

---

[1] The Executive Committee transferred the case to this Court on January 5, 2015. (R. 140.)

2

## LEGAL STANDARD

Rule 59(e) permits parties to file, within twenty-eight days of the entry of judgment, a motion to alter or amend the judgment. *See* Fed. R. Civ. P. 59(e). Motions under Rule 59(e) serve the limited function of allowing the Court to correct manifest errors of law or fact or consider newly discovered material evidence. *See Seng–Tiong Ho v. Taflove*, 648 F.3d 489, 505 (7th Cir. 2011); *United States v. Resnick*, 594 F.3d 562, 568 (7th Cir. 2010). "It is well established that a motion to reconsider is only appropriate where a court has misunderstood a party, where the court has made a decision outside the adversarial issues presented to the court by the parties, where the court has made an error of apprehension (not of reasoning), where a significant change in the law has occurred, or where significant new facts have been discovered." *Broaddus v. Shields*, 665 F.3d 846, 860 (7th Cir. 2011), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013). Rule 59(e) "does not provide a vehicle for a party to undo its own procedural failures" or "introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment." *Resnick*, 594 F.3d at 568 (quoting *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000)); *see also Cnty. of McHenry v. Ins. Co. of the West*, 438 F.3d 813, 819 (7th Cir. 2006). Whether to grant a Rule 59(e) motion "is entrusted to the sound judgment of the district court." *Matter of Prince*, 85 F.3d 314, 324 (7th Cir. 1996); *see also Anderson v. Catholic Bishop of Chicago*, 759 F.3d 645, 652 (7th Cir. 2014) (reviewing district court's denial of Rule 59(e) motion for abuse of discretion).

## ANALYSIS

As an initial matter, Craftwood requests an opportunity to respond to the concerns raised by the Court in its March 2015 Opinion that Craftwood did not address in its original motion for

attorney's fees. Because Defendants agreed in the settlement not to oppose Craftwood's requested attorney's fee award and no class members filed objections, the Court independently scrutinized Craftwood's request for fees under relevant Seventh Circuit law. *See Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014) ("[t]he judge asked to approve the settlement of a class action is not to assume the passive role that is appropriate when there is genuine adverseness between the parties…[c]ritically the judge must assess the value of the settlement to the class and the reasonableness of the agreed-upon attorneys' fees for class counsel, bearing in mind that the higher the fees the less compensation will be received by the class members.") To allow Craftwood an opportunity to respond to the Court's reduction of its requested attorney's fees in the March 2015 Order, the Court grants Craftwood's motion for reconsideration to the extent it requests that the Court consider the merits of its supplemental arguments that it did not raise in its original motion. *See Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 652 (7th Cir. 2011) ("…a district court must afford plaintiffs an opportunity to respond when the court raises concerns about the fee petition that are based upon its independent scrutiny of the record or when the court establishes reasons *sua sponte* for reducing the fee award.")

Thus, the Court examines Craftwood's additional substantive arguments, which consist of three main grounds for amending the Court's March 2015 Opinion. First, Craftwood argues that the Court should award it a flat rate attorney's fee, rather than a sliding-scale fee. Second, it contends that the Court should award it a higher overall fee percentage of 30 percent, rather than the 23.75 percent that the Court awarded. Finally, even if the Court does award a sliding-scale fee, Craftwood argues that the Court should increase the fee percentages to better reflect the risks

of Plaintiff's case. For the reasons explained below, the Court denies Craftwood's motion to amend the judgment to increase its attorney's fee award.

**I.      Fixed Rate Attorney's Fee**

Craftwood first argues that the Court should award it a fixed rate attorney's fee rather than a sliding-scale fee. As the Court stated in its March 2015 Opinion, however, the Seventh Circuit in *Silverman v. Motorola Solutions, Inc.* recently discussed in depth its approval of awarding sliding-scale attorney's fee percentages in multi-million dollar class settlements:

> [N]egotiated fee agreements regularly provide for a recovery that increases at a decreasing rate…
>
> Many costs of litigation do not depend on the outcome; it is almost as expensive to conduct discovery in a $100 million case as in a $200 million case. Much of the expense must be devoted to determining liability, which does not depend on the amount of damages…There may be some marginal costs of bumping the recovery from $100 million to $200 million, but as a percentage of the incremental recovery these costs are bound to be low. It is accordingly hard to justify awarding counsel as much of the second hundred million as of the first. The justification for diminishing marginal rates applies to $50 million and $500 million cases too, not just to $200 million cases …
>
> Awarding counsel a decreasing percentage of the higher tiers of recovery enables them to recover the principal costs of litigation from the first bands of the award, while allowing the clients to reap more of the benefit at the margin (yet still preserving some incentive for lawyers to strive for these higher awards).

*Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 959 (7th Cir. 2013). Craftwood's reconsideration motion simply does not address *Silverman* or the Court's rationale in the March 2015 Opinion for setting a sliding-scale, rather than a fixed rate, attorney's fee. Craftwood also acknowledges that this argument is "not the central focus" of its reconsideration request. (R. 157-1, Pl.'s Brief at 9.) Accordingly, the Court denies Craftwood's motion to amend the judgment on this basis.

5

## II. Overall Attorney's Fee Percentage

Craftwood next argues that the Court should award it an overall fee award of 30 percent, rather than 23.75 percent. In support of its argument, Craftwood first takes issue with the Court's reliance on two class action fee studies in determining the overall attorney's fee percentage: Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Studies 248 (2010); and Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Studies 811 (2010). Craftwood's argument is based on the Seventh Circuit's recent decision in *Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014). In *Redman*, the Seventh Circuit held that in calculating the attorney's fee percentage in a class action settlement, a court should compare the attorney's fee with the total amount received by plaintiffs, exclusive of administrative costs. *Id*. at 630. Based on *Redman*, Craftwood argues that in so-called "reversionary" settlements, in which portions of the settlement that are not claimed by class members revert back to the defendants, courts should only consider the amounts actually received by class members in setting an attorney's fee. Using this reasoning, Craftwood contends that the Court should not base its attorney's fee award on the Eisenberg & Miller and Fitzpatrick class action fee studies because they calculate inaccurately low attorney's fee percentages due to their inclusion of reversionary settlements. There are several problems with this argument.

First, *Redman* did not address the sources of information that district courts should consider in determining an appropriate attorney's fee. Instead, it addressed the entirely different issue of how courts should calculate the value of a settlement to the class, and specified that courts should set the attorney's fee in comparison with that figure. *Redman*, 768 F.3d at 630.

*Redman* instructs that in assessing the reasonableness of an attorney's fee award, courts should compare the attorney's fee to the amounts that class members actually receive, not the potentially higher total number that defendants agree to pay. *Id*. In this case, for example, the class received a settlement of $40 million, less certain administrative costs and the class incentive fee. Accordingly, the Court determined an appropriate sliding-scale formula for calculating the attorney's fee, and then applied it to the approximately $40 million overall recovery, awarding Plaintiff's counsel $9.5 million. If, on the other hand, the $40 million settlement had only resulted in $30 million of payments to the class because certain unclaimed amounts reverted to Defendants, then under *Redman* the Court would have applied its attorney's fee formula only to the $30 million actually received by the class. Using that calculation,[2] the Court would have awarded an overall attorney's fee award of $7.5 million.[3] In other words, *Redman* instructs courts to determine an appropriate attorney's fee in comparison with the amounts actually received by the class. It did not hold that in setting an attorney's fee courts should only consider the fees set by courts in non-reversionary settlements.

Next, Craftwood argues that under *Redman* the attorney's fee percentages in the Eisenberg & Miller and Fitzpatrick studies relied upon by the Court are necessarily too low. Craftwood contends that because those studies include instances in which courts awarded compensation to class counsel based on the total amounts defendants agreed to pay in reversionary settlements, the studies result in inaccurately low attorney's fee percentages. The Eisenberg & Miller and Fitzpatrick studies summarized their methodologies for determining class recoveries as follows: "If the court stated a range of value (e.g., for the amount of class

---

[2] Redman instructs courts to calculate the attorney's fee percentage by comparing: 1) the attorney's fee; with 2) the attorney's fee plus the amounts actually received by the class. *Redman,* 768 F.3d at 630.

[3] As shown by this example, under *Redman* the Court is effectively awarding Craftwood's counsel additional compensation because the settlement is non-reversionary.

7

recovery), we used the midpoint. If there was no better estimate available but a maximum recovery value could be ascertained, we used the maximum possible recovery. If the court estimated the relief at 'over' or 'more than' a sum, the sum that was the minimum was used." Eisenberg & Miller, 7 J. Empirical Legal Studies at 251. Fitzpatrick used amounts that "reflect only what defendants *agreed to pay*; they do not reflect the amounts that defendants *actually paid* after the claims administration process concluded." Fitzpatrick, 7 J. Empirical Legal Studies at 826 (emphasis in original).

There are several issues with this argument. First, the Seventh Circuit in *Silverman v. Motorola* relied on the Eisenberg & Miller and Fitzpatrick studies extensively in an opinion on attorney's fees in a non-reversionary class action settlement just one year before *Redman*. *See Silverman*, 739 F.3d at 958; Stipulation of Settlement, *Silverman v. Motorola*, No. 07 C 4507 (N.D. Ill. Feb. 2, 2012) (R. 445, at 15-17.) As discussed above, *Redman* did not indicate that it intended to shift the data on which courts could rely in determining an appropriate attorney's fee percentage. Thus, the Court assumes the Seventh Circuit continues to approve of the use of these studies in calculating attorney's fees in non-reversionary class action settlements.

Next, Plaintiff does not show that the inclusion of reversionary settlements in the Eisenberg & Miller and Fitzpatrick studies impacts their validity here. In the March 2015 Opinion, the Court relied on these studies to estimate the attorney's fees set by courts. Craftwood does not show that *Redman* impacts the accuracy of those figures. Using the scenario above, for example, if a court awarded an attorney's fee on a $40 million settlement based on a flat rate of 23.75%, the attorneys would receive $9.5 million. If $10 million of that settlement reverted back to the defendants, the plaintiffs would only receive $30 million (including attorney's fees). If the court did not account for the reversion, then under *Redman* the court

8

would have effectively awarded an attorney's fee percentage of 31.7%. Craftwood would argue that this shows that the court "set" an attorney's fee percentage of 31.7%. In reality, however, the court simply based the attorney's fee percentage on the total amount of the settlement, not on the final amount ultimately recovered by the class. In other words, even though *Redman* would calculate the attorney's fee differently, the court intended to set an attorney's fee of 23.75%, not 31.7%. The Eisenberg & Miller and Fitzpatrick studies would both accurately record that lower number as the attorney's fee percentage set by the court.

Although there may be instances in which courts in the Eisenberg & Miller and Fitzpatrick studies applied a *Redman*-type framework and intentionally set a higher attorney's fee percentage on the lower amount that the class ultimately recovered, Craftwood does not show that to be the case. Further, the methodologies of the Eisenberg & Miller and Fitzpatrick studies indicate that they would have attempted to accurately capture those situations. The Eisenberg & Miller study only used a "maximum recovery value" where "there was no better estimate available." Eisenberg & Miller, 7 J. Empirical Legal Studies at 251. While Fitzpatrick used amounts that reflected "what defendants *agreed to pay*," not "amounts that defendants *actually paid* after the claims administration process concluded," there is no indication that the Fitzpatrick study would have disregarded instances where courts intentionally set attorney's fees based on the lower amounts actually recovered by the classes in reversionary class settlements. Fitzpatrick, 7 J. Empirical Legal Studies at 826 (emphasis in original). Accordingly, Craftwood does not show that the Eisenberg & Miller and Fitzpatrick studies inaccurately reflect the attorney's fee percentages set by courts.

Finally, Craftwood argues that the Court should replace the Eisenberg & Miller and Fitzpatrick studies with attorney's fee percentages that Craftwood calculated based on

approximately twenty-six recent non-reversionary class action settlements in the Northern District of Illinois. The Court respectfully declines to use those figures. The Eisenberg & Miller and Fitzpatrick studies included a much larger sample size, 689 and 688 settlements, respectively, and as discussed above the Seventh Circuit has cited them approvingly as recently as 2013. *See* Eisenberg & Miller, 7 J. Empirical Legal Studies at 251; Fitzpatrick, 7 J. Empirical Legal Studies at 813. The Court also set the sliding scale fee in this case based in part on a similarly structured fee awarded by the Seventh Circuit. *See In re Synthroid Mktg. Litig., ("Synthroid II")*, 325 F.3d 974, 980 (7th Cir. 2003). For these reasons, the Court denies Craftwood's motion to the extent it argues that the Court should award an overall attorney's fee percentage of 30 percent.

### III. Sliding-Scale Percentages

Finally, Craftwood argues that if the Court decides to retain a sliding-scale attorney's fee, it should adjust the percentages to result in a higher average fee award to better reflect the risks of its case. In support of its argument, Craftwood discusses in detail two recent decisions by Judge Holderman in the Northern District of Illinois: *In re Capital One Telephone Consumer Protection Act Litigation*, ____ F.Supp.3d ____, No. 12 C 10064, 2015 WL 605203 (N.D. Ill. Feb. 12, 2015); and *Wilkins v. HSBC Bank Nev., N.A.*, No. 14 C 190, 2015 WL 890566 (N.D. Ill. Feb. 27, 2015). Both of those cases were TCPA class action settlements in which the court set a sliding-scale attorney's fee. In *Capital One*, the court conducted a detailed analysis to determine the market rate contingent fee for a TCPA class action. *Capital One*, ____ F.Supp.3d ____, 2015 WL 605203, at *11-16. After conducting that analysis, the court found the market rate in a typical TCPA class action to be a sliding-scale fee that matches exactly the sliding-scale fee set by the Court in this case: 30 percent of the first $10 million, 25 percent of the next $10 million,

10

and 20 percent of the amounts from $20 million to $45 million. *Id*. at *16 n.13. After examining the risk factors specific to the facts of that case, the court increased the attorney's fee percentage for the first $10 million band of recovery to 36 percent from 30 percent because it found the case to be "slightly riskier" than a typical TCPA class action. *Id*. at *17-18. It then awarded an attorney's fee based on the market rate with the adjusted percentage for the first band of recovery. *Id*. at *18. In *Wilkins*, the court used the sliding-scale market rate structure it determined in *Capital One*. *Wilkins*, 2015 WL 890566, at *10. *Wilkins* applied the market rate structure without adjustment because it found the case to be an "average" TCPA class action that, unlike *Capital One*, did not warrant an upward or downward adjustment in the fee based on the risks of the case. *Id*. at *11.

Plaintiff argues that although the *Capital One* court determined the market rate attorney's fee in TCPA cases to be the exact same sliding scale set by the Court in this case, the Court should increase the attorney's fee percentages here because this case is inherently riskier due to it being a "junk fax" TCPA case rather than a "robocall" TCPA case like *Wilkins* and *Capital One*.[4] Rather than evaluate the risk determinations in *Wilkins* and *Capital One*, however, the Court stands on its finding in the March 2015 Opinion that the percentages that the Court set are appropriate based on all four factors specified by the Seventh Circuit. *See In re Synthroid Mktg. Litig. ("Synthroid I")*, 264 F.3d 712, 721 (7th Cir. 2001) (the "market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case.") The risk level of a case is only one factor, and the Court examined all four factors in

---

[4] Craftwood also disagrees with the market rate TCPA fee scale set by the court in *Capital One* because it relies on reversionary as well as non-reversionary settlements. For the reasons discussed above with respect to the Eisenberg & Miller and Fitzpatrick studies, this argument is not persuasive.

11

depth in determining that the sliding-scale attorney's fee percentages it set were appropriate. Specifically, the Court found:

> With respect to the risk of nonpayment, the Court agrees with Plaintiff that this case posed some risks. At the outset, it was not apparent that Interline would have records sufficient for Plaintiff to prove that Interline had sent a large number of faxes in violation of the JFPA. There was also a risk that Interline would be able to show that fax recipients had consented to their receipt, or that Interline had an established business relationship ("EBR") with certain of the recipients. As a putative class action, Plaintiff also faced the risk that the Court would not certify the class, either because of these two defenses, or because of other potential class issues. Nevertheless, while there were some risks, the Court does not find that they were so great that they would have justified a higher contingency fee for Plaintiff's counsel at the commencement of the case.
>
> With respect to the quality of Plaintiff's counsel's performance, the Court notes that it did not become involved in this case until shortly before settlement. Nevertheless, the work of Plaintiff's counsel that the Court has had the opportunity to assess has been of a high quality, commensurate with their several decades of class action experience, including as former lead counsel in several major class actions. (*See* R. 142-2, Zimmerman Dec., and R. 142-3, Cordero Dec.) Plaintiff's counsel also secured a significant victory when Judge Grady ruled that as a discovery sanction Defendants were precluded from asserting PEP or EBR defenses. As far as the amount of work necessary to resolve the litigation, Plaintiff's counsel fought to secure the written discovery it needed and took twelve depositions, but the case settled before contested class certification briefing, summary judgment, or trial. Viewed from an ex ante perspective, the plaintiff class and its prospective counsel may have expected the case to be more difficult to resolve, but it would have been reasonable to expect that it had a good chance of being settled once the magnitude of any TCPA violations became clear in discovery. Finally, the Court does not find that the stakes of the case would impact the attorney's fee. The legal issues were not particularly unique, and although the settlement ended up being large because of the size of Defendants' potential TCPA liability, that contingency could have been addressed through a sliding-scale attorney's fee percentage that declined with the total amount of recovery.

(R. 152, March 2015 Opinion.)

The Court then applied that analysis in setting the attorney's fee, using the figures in the Eisenberg & Miller and Fitzpatrick studies and the Seventh Circuit's opinion in *Synthroid II* as a reference point. Craftwood does not provide a persuasive reason to increase that fee, especially given that the *Capital One* court determined the market rate attorney's fee in TCPA cases to be the exact same sliding scale set by the Court here. Thus, the Court denies Craftwood's request to

12

increase the sliding-scale attorney's fee percentages that the Court awarded in its March 2015 Opinion.

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiff's motion to amend the judgment.


**DATED: May 6, 2015**                                **ENTERED**

                                                      _____
                                                      AMY J. ST. EVE
                                                      U.S. District Court Judge